682 So.2d 301 (1996)
STATE of Louisiana
v.
Alfred OLIVER.
No. 94-KA-1642.
Court of Appeal of Louisiana, Fourth Circuit.
October 9, 1996.
*302 Harry F. Connick, District Attorney, Kim Madere Graham and Richard R. Pickens, Assistant District Attorneys, New Orleans, for the State of Louisiana/Appellee.
Sherry Watters, Orleans Indigent Defender Program and Robert Glass, Glass & Reed, New Orleans, for Alfred J. Oliver, Jr./Appellant.
Before SCHOTT, C.J., and PLOTKIN and WALTZER, JJ.
WALTZER, Judge.
STATEMENT OF THE CASE
Alfred Oliver was charged with one count of armed robbery, a violation of La.R.S.14:64 and two counts of second degree kidnapping, a violation of La. R.S.14:44.1. A twelve member jury found him guilty on all three counts. After a motion for a new trial was denied, Oliver waived delays and was sentenced on the robbery count to serve 50 years at hard labor and on the kidnapping counts to serve 15 years each at hard labor. All the sentences were ordered to be served without benefit of parole, probation, or suspension of sentence and to be served consecutively. Oliver's motion to reconsider his sentence was denied. Oliver was found to be a quadruple felony offender; his sentence on the armed robbery was vacated, and he was resentenced on that count to serve ninety-nine years at hard labor without benefit of parole, probation, or suspension of sentence.
Initially, Oliver was represented on appeal by an attorney of the Orleans Indigent Defender Program. She assigned two errors for our consideration:
1) that the trial court erred in denying the motion for mistrial based on the impermissible and prejudicial argument of the prosecutor; and
2) that the trial court erred in imposing an unconstitutionally excessive sentence by ordering that the sentence on each count, arising from the same incident, be served consecutively.
*303 This Court granted a motion to substitute retained counsel. New counsel's briefing schedule was interrupted to allow counsel to supplement the record with a transcript of pre-trial motions. Counsel added supplemental assignments of error:
1) the district court erred in denying Oliver's motion for mistrial based on the impermissible and prejudicial closing argument of the prosecutor, who personally vouched for the credibility of a crucial prosecution witness;
2) the cumulative effect of other inadmissible evidence and impermissible closing argument, plus other defects, warranted the mistrial;
3) it was error to refuse a new trial;
4) the prosecution withheld exculpatory evidence from defense counsel;
5) appointed trial counsel was ineffective.
Briefing was concluded approximately a year after the initial appellate brief was filed. Thereafter, this Court remanded the case to the trial court for a hearing to determine whether and when defense counsel was provided with exculpatory materials, including a copy of the initial and supplemental police reports, in possession of the State. A transcript of this hearing has been furnished to us, along with documentary evidence[1] and post-remand briefs by the parties.
PROCEDURAL BACKGROUND
The minute entries trace the unfortunate path of the highly relevant but elusive police reports. The Bill of Information was filed on 11 March 1994. On 16 March 1994 Oliver was arraigned with the assistance of appointed counsel, Mr. Kevin Linder. Hearings were set for and held 24 March 1994. The court found probable cause and all other motions were denied. Oliver was still represented by Linder, after a trial continuance on 9 May 1994 the trial court moved the trial of this matter to 23 May 1994.
On the very day of trial, Messrs. Ross Scaccia and Mark Nosacka were appointed to represent Oliver at trial. Up to this point, Scaccia had not been assigned to this case and had no independent knowledge of prior statements by the victims and prior testimony by Officer Sislo at the pretrial motion hearing. Counsel was unaware of the existence of the police reports to which his client was entitled as a matter of law.[2] There is testimony at the hearing on remand that no one can recall with any specificity what was turned over by Linder to Scaccia.[3] We do *304 know, however, that the record does not show a request by Scaccia to be furnished with a transcript of the motion hearing or any reports. More troubling is the fact that Scaccia did not request a continuance based on his instanter appointment as trial counsel, and the unavailability of the transcript of the pretrial motion hearing.
STATEMENT OF FACTS
In the early morning hours of 14 November 1993, the police were called concerning an alleged robbery and kidnapping which occurred at the corner of Almonaster Boulevard and Louisa Street. The alleged victims of the crime, Levone Coleman and Ramon Gray, subsequently identified Oliver as one of the men who robbed and kidnapped them. Ultimately, Oliver was arrested while in possession of a gun and hiding in a closet in an apartment in the Fischer Housing Development.
LEVON COLEMAN'S TRIAL TESTIMONY
Levone Coleman testified that he and Ramon Gray were driving in Gray's car to get something to eat when they stopped for a traffic light at the corner of Almonaster and Louisa. Suddenly, a man with a gun approached the driver's side of the car and two other males approached the passenger side, where Coleman was sitting. The man with the gun ordered Gray to open the car door, and the three males then got in the back seat of the car. The men repeatedly ordered Gray to keep driving, or he would be shot. At the men's direction, Gray drove into the parking lot of a nearby apartment complex. At that point, a woman looked out of the door of one of the apartments. Coleman testified that he used this distraction to jump out of the car and to hide in some nearby bushes. Coleman testified that one of the men, whom he identified as Oliver, took the gun from the original gunman, got out of the back seat and got into the front seat next to Gray. The car then left the scene.
Coleman testified that he walked to a nearby grocery store to call the police, but because his wallet had been left in the car and he could not get through to 911, he called his brother collect and had his brother call the police. He testified that police officers soon arrived, and he rode with them through a nearby housing development looking for the perpetrators or Gray to no avail. He then went to the police station to make a report of the incident.
Coleman testified that he recognized Oliver because they had gone to the same grammar school, but Coleman had not seen Oliver for at least ten years.
Coleman testified that he was gay, but was not aware of Oliver's sexual orientation.
RAMON GRAY'S TRIAL TESTIMONY
Ramon Gray testified that on the night of the kidnapping, he and Coleman were going to get something to eat when they stopped at a traffic light at Almonaster and Louisa. He testified that a man ran up to his window with a gun, while another man he identified as Oliver and a male youth ran up to the passenger side of this car. In response to the gunman's order, he opened his door, and the man with the gun got in the back seat of the car behind him, while Oliver and the youth got in the back seat from the passenger side. The men ordered Gray to drive. He testified that he refused to drive into a wooded dead-end street, but instead drove into the parking lot of an apartment complex. He testified that when a woman looked out of her door, Coleman jumped out of the car. The man behind him passed the gun to Oliver, who got out of the car to look for Coleman, but Coleman had disappeared. Oliver then got in the front seat just as Gray was starting to get out of the car. Oliver forced Gray back into the car and ordered him to drive from the scene.
Gray further testified that Oliver ordered him to stop at a gas station, took money out of Gray's wallet, and handed the money to the man in the back seat. The man pumped gas and reentered the car, and Oliver ordered Gray to drive away from the station. Gray testified that Oliver told him that the last person who did not cooperate with him got shot. Oliver directed him to drive to Club Rumors, where Oliver planned to rob someone. Because there were too many people in the area of the club, Oliver directed Gray to Canal Street, where they picked up an acquaintance of Oliver. Gray testified they took the man to Elysian Fields Avenue, *305 and Oliver then ordered Gray to drive across the river to the Fischer Housing Development. Once there, Oliver gave the gun to the other man and left the car with the car keys, telling them to wait. Approximately twenty minutes later, Oliver returned, got back in the car, and told Gray to drive back to Club Rumors. This time, the place was deserted, and Oliver directed him to drive back to the Fischer Housing Development. Once there, Oliver ordered Gray out of the car, and the group went to a third-floor apartment. Gray testified that Oliver went into a bedroom which was occupied by a woman and a group of children, and he heard Oliver tell the woman that they had kidnapped a man. The woman told Oliver not to "do him anything". According to Gray, Oliver reappeared and led the group back to the car. Gray testified that by this time it was beginning to get light, but the area was still deserted. They began driving and passed a girl "down the street." Oliver had Gray stop the car and he got out, but the girl screamed and ran inside a nearby apartment. During this incident, Gray tried to escape, but Oliver turned the gun on him and ordered him to get back in the car. At Oliver's direction, they drove onto the expressway, where Oliver noticed a car with a Florida license plate. They followed the car to a gas station and then to a restaurant, intending to rob the car's occupants, but Oliver got tired of waiting in the restaurant parking lot and directed Gray to drive around. When they returned to the restaurant, the Florida car had gone. They returned to the Fischer Housing Development, where Oliver told Gray they would release him because he had cooperated with them. Gray then drove home and called the police.
Gray testified that he chose Oliver's picture from a photographic lineup. He denied knowing Oliver or the other two males who entered his car that night. He also denied being gay, and he insisted Coleman was not his lover. He testified he viewed the photographic lineup after talking with Coleman, who told him that he had recognized Oliver from grammar school.

TESTIMONY FOR THE DEFENSE
Darren Oliver, Alfred Oliver's brother, testified that he is gay and that Alfred is bisexual. He identified Gray as Alfred's former lover.
Alfred Oliver, Sr., the defendant's father, swore that the defendant was at his house playing cards, as was his usual habit on Friday, Saturday and Sunday nights, at the time of the kidnappings. He testified that the defendant was unemployed and had been at his house all day.
Oliver denied kidnapping or robbing Gray and Coleman, insisting he was home with his father on the night of the kidnapping, playing cards as he normally did on weekends. He testified he is bisexual and has had relationships with both Gray and Coleman. He testified that sometime prior to the alleged kidnapping, he told Coleman he did not want to have anything to do with him because he had heard that Gray had AIDS. He testified that in response, Coleman told him that if he could not have Oliver, no one would have him. Oliver denied he committed the kidnapping and the robbery, and now claims that the alleged victims fabricated their testimony to avenge Coleman's failed relationship.
ASSIGNMENTS OF ERROR
Oliver asserted inter alia that the prosecutor did not turn over to defense counsel a police report that would have formed the basis of cross-examination of the alleged victims and would have destroyed their credibility.
Because we find that the prosecutor breached his affirmative duty to turn over valuable exculpatory and impeachment material to the defense contained in all police reports, whether incidental or supplemental, at the latest when the victims testified at trial contradictorily to the statements contained in those reports, we reverse the conviction and the sentences and remand for a new trial. Because we find merit in this, Oliver's supplemental assignment of error Number 4, we do not address the other assignments.
We conclude that Oliver was denied due process of law and that the verdict reached *306 in this case was not worthy of confidence. We further find that the inconsistencies between the reported statements of the alleged victims and their trial testimony create a reasonable probability of a different verdict, had the jury been made aware of the variances.
SUMMARY OF THE CONFLICTS BETWEEN THE UNDISCLOSED REPORTS AND VICTIMS' TRIAL TESTIMONY
Franklin/Charles Report: Statement of Levone Coleman taken on 14 November 1993: When the perpetrators approached the victims' car, the perpetrator with a gun immediately pointed a gun at Gray's head and demanded that Coleman get out of the vehicle, which continued Southbound down Louisa Street while Coleman walked to the 3400 block of Louisa Street and called police. This contradicts Coleman's and Gray's trial testimony that Coleman escaped from an apartment complex parking lot into some nearby bushes while the perpetrators were momentarily distracted, and after Coleman had driven around with the perpetrators for some time; it also contradicts the Sislo/Nevil report and Officer Sislo's testimony at the pretrial hearing.
Gabriel report: On 5 December 1993 Officer Gabriel was approached by Ramon Gray: Gray said that on 14 November 1993 he was approached by three unknown black males at gunpoint who ordered Coleman out of the vehicle and ordered Gray to drive. This conflicts with the alleged victims' trial testimony concerning Coleman's escape.
Sislo testimony at pretrial hearing 24 March 1994, essentially consistent with the Sislo/Nevil report of 7 December 1993, made after the officers reviewed Officer Len Davis' report of Coleman's statement of 14 November 1993: When three perpetrators got into the victims' car, Oliver had a gun in his hand, the victims started to get out of the car but Gray was ordered to drive and drove a short distance. When Gray came to another stoplight, Coleman jumped out of the car and ran. This contradicts Coleman's and Gray's trial testimony concerning Coleman's escape, and contradicts Coleman's and Gray's trial testimony that Oliver was not the original gunman, but took the gun from the original gunman when Oliver got out of the back seat and into the front seat next to Gray. The Sislo/Nevil Report also includes a summary of the officers' re-interview of Ramon Gray: Gray said Oliver was the original gunman, which contradicts Gray's trial testimony; Gray said that Coleman escaped after they had driven awhile and had stopped at a stoplight, which contradicts Gray's and Coleman's trial testimony and Coleman's statement in the Franklin/Charles report.
The Report of Officer Len Davis upon which the Sislo/Nevil Report is based notes that Coleman told Officer Davis, who responded to Coleman's call on 14 November 1993, that he was familiar with one of the perpetrators, and identified him to Davis as Alfred Oliver.

THE UNDISCLOSED REPORTS
When the instant record was lodged, it contained an "incident report" (hereafter Franklin/Charles report), that did not bear the clerk of court's "filed" stamp. This report was neither referred to in the record nor marked as an exhibit. There was no other police report in the record nor was there a minute entry showing that the State had furnished any report to the defense at any time. There was no indication in the record that appointed counsel had asked for a report.

THE MISSING TRANSCRIPT OF THE PRE-TRIAL HEARING
The appellate record reflects that there was no formal written motion for discovery and inspection, motion to suppress and preliminary hearing in the district court. We are informed that in Section "J" of Criminal District Court, pretrial motion hearings are set routinely by the court and without request by anyone.
When the record was lodged, it did not contain a transcript of the hearing on pretrial motions at which Officer Sislo testified. This pretrial hearing had not been transcribed before trial commenced, and it was not transcribed and furnished to this court until newly retained defense counsel's request on 4 August 1995. Although the transcript shows that Officer Sislo referred inferentially to a report of a domestic disturbance, *307 Officer Sislo testified that he had not seen that report. Neither at the time of the hearing nor at any other time was one word uttered for the record that would indicate that the incident report or any other report had been tendered to the defense.
At the conclusion of the pretrial hearings the court below ruled:
Based on the testimony of Officer Sislo, the Court will find that there is probable cause for the arrest. I'll deny the Motion to Suppress the Identification. Deny the Motion to Suppress the Evidence. (Emphasis supplied.)
Had the record contained a transcript of the pretrial hearing, Scaccia would have learned that Officer Sislo had testified to the following version of events:
The victims had stopped at a red light and were returning home. Gray was driving in his car, and he was dropping Coleman off at his residence in route to Coleman's residence. And it was 4:45 in the morning. They stopped at a red light at Almonaster and Louisa. As they were stopped at the light, three subjects came up to the car. One subject, Oliver, had a gun in his hand. The victims then started to get out of the car, and they were ordered back into the car. The three perpetrators got into the car and ordered Mr. Gray to drive. He then drove a short distance. They attempted to get him to drive down a dark street. Mr. Gray refused and wouldn't turn down the street. When he came to another stoplight, the victim Coleman jumped out of the car and ran.... (Emphasis supplied.)
At the motion hearing, Officer Sislo testified consistently with a report he and Officer Nevil had confected (hereafter Sislo/Nevil report). This report was also not furnished to the defense.
Since the transcript of this hearing was not filed into the record until after the appeal was lodged and appellate counsel moved to supplement the record, Scaccia had no evidence of the contradictory statements concerning the escape from the car.
TESTIMONY ADDUCED AT 12 APRIL 1996 HEARING ON REMAND
Three district attorneys who prosecuted this case prior to trial testified at the hearing. Bruce Dearing was initially in charge of the case, but left the District Attorney's office prior to trial. He testified that it was his policy to turn over all incident police reports as well as supplemental reports if the incident reports did not meet the requirements of State v. Shropshire, 471 So.2d 707 (La. 1985). Prior to doing so he would black out witnesses' addresses and telephone numbers. He could not remember if he had turned over any reports to the defense in this case. He testified that the record contained a copy of the 14 November 1993 police report prepared by Officers Franklin and Charles, but the handwriting on the report was not his. He testified that the record did not contain a copy of the 7 December 1993 supplemental report written by Officers Sislo and Nevil.
Assistant District Attorneys Dwayne McClure and Keith Detweiler tried the case. McClure testified that he became involved in the case only a few weeks before trial, and he could not recall having given any police reports to the defense. He explained that the District Attorney's file contained two reports with information blacked out, one an incident report and the other a supplemental report. One of these reports was the 7 December 1993 Sislo/Nevil report.
Detweiler testified that he became involved in the case shortly before trial, and he also could not remember having given any police reports to the defense.
Kevin Linder testified he was the O.I.D.P. attorney who originally handled the case. He received a copy of the 14 November 1993 Franklin/Charles report, but he did not remember having seen a copy of the Sislo/Nevil report. He testified that he probably put a copy of the Franklin/Charles report in his briefcase when he received it. He testified that he was transferred to another section of court a few weeks before the trial and that he probably gave the report to Ross Scaccia (the O.I.D.P. attorney who eventually handled the trial) or to Janet Capiton (an O.I.D.P. employee) to give to Mr. Scaccia.
*308 Ms. Janet Capiton testified that presently O.I.D.P. does not have a trial file on this case. She produced a card which indicated that while no trial file exists, Ms. Sherry Watters (O.I.D.P. appeal counsel who first handled this case) had her own appeal file.
Ms. Sherry Watters testified that she never saw an O.I.D.P. trial file in this case. She testified that she prepared an appeal file from the appeal record.
Ross Scaccia testified that he was assigned to Section "J" a few weeks before trial in this case. He testified that he vaguely recalled having received a file from Kevin Linder, and supposed that police reports were in the file, but he had no independent recollection of any police report. He testified also that because he was newly-employed by O.I.D.P. at that time, he did not know if he would have been aware that police reports would have been in the file. He also testified that he was aware motion hearings had been held, but he did not remember having seen any transcripts in the file. He testified that he noticed the copy of the Franklin/Charles report in the record when he was reviewing it in preparation for the hearing on remand. He could not say, however, if he had had the report at the time of trial. He testified that had he been aware of the inconsistencies between Coleman's statement in this report and his trial testimony, he would have used the report to impeach Coleman's credibility. He testified that he was unaware of the Sislo/Nevil report, which contained an inconsistency as to which perpetrator had the gun when the trio first approached Coleman and Gray, and contradicts Coleman's testimony concerning the location of the escape. Nor was counsel aware of the report made 5 December 1993 by Officer Gabriel (hereafter Gabriel report), which also contained an inconsistency concerning when Coleman left the car. He stated, however, that even if he had had these last two reports, he was not sure that he would have used them. According to Mr. Scaccia, during trial he was convinced that the jury did not believe either of the victims due to the "convoluted" story they had given, and he testified he did not want to "nauseate" the jury any more than the victims had done:
And consequently, I may have just gone ahead and said it's my decision not to use this. They have already destroyed themselves.
He acknowledged that this possible trial strategy was not successful:
Now, I wasn't correct. They found the defendant guilty but that may well have been by trial strategy. That's the only reason I can explain why if I had this I didn't use it, unless I never had it at all. Unless I never had it at all. And so, I just tell you that for what it's worth.
THE IMPACT OF THE ABSENCE OF THE REPORTS
At trial, defense counsel neither requested that a transcript of a pretrial hearing be furnished to him, nor moved for a continuance based on its unavailability. Such a motion is proper under La.C.Cr.P. art. 294(D), and C.C.Cr.P. art. 297.[4] Had the trial court denied a delay because of the unavailability of the transcripts, counsel could have objected and sought supervisory review of the trial court's decision.
Defense counsel went to trial without the incident and supplemental reports and without a transcript of the pretrial hearing. Counsel had none of the material which could have impeached the alleged victims, whose testimony formed the substance of the State's case. In order to compound matters, once the prosecution became aware that the witnesses testified at variance with their previous statements, it failed to advise defense *309 counsel of this exculpatory evidence. More egregiously, in the face of these divergent statements, the State failed to turn over to the defense all reports that would have made possible the vigorous and meaningful cross-examination of the two "star witnesses" to which Oliver was entitled.
There is no doubt that this case turns on the credibility of the alleged victims. In his opening statement the prosecutor gave the jury an overview of the case and stated in regards to Gray's or Coleman's possible escape from the car:
The gunman at this point orders Ramon [Gray] to drive and he does drive. He drives down the road, he makes a right turn at the command of the gunman at this point. And as he is following the directions he realizes that the last direction is going to lead him to a dead-end, because he is familiar with that wooded area back there, and he'll tell you about that. So he takes a right. At this point the gunman, unknown subject this time, gets angry and Ramon [Gray] pulls up into an apartment complex, it's called Higgins Apt. complex. And he does this for whatever reason, but may be one of them can escape. They pull into the apartment complex and they stop the car. They notice there's a lady a distance forward of the car. It's dark out there, but they can see her at a distance, 20 or 30 feet. And they think, "This is the only time we're going to get out of the car alive. Lee [Coleman] bolts out of the driver'sexcuse me, out of the passenger's side and Ramon tries to get out of the driver's side, but the gunman in the back says, "Back in the car." Lee [Coleman] runs to some bushes nearby. And at this point is where the defendant, who is now sitting behind the passenger that has just exited the car, gets hold of the gun, gets into the front seat of the car and someone screams, "you should have shot him. You should have shot him." At this point Lee [Coleman] is in the safety of the bushes. (Emphasis added.)
In closing argument the prosecutor said inter alia:
I can stand up here and go through each little second, each little second, each little minute of that whole ordeal, as you heard earlier, but I'm not going to do that because again, it comes down to the credibility of the two witnesses of this case. (Emphasis added.)
It is clear from the opening and closing statements that the prosecutor portrayed Coleman's escape from the car as requiring great risk, luck and skill, while the various statements in the 14 November 1993 Franklin/Charles and 5 December 1993 Gabriel police reports record Coleman as telling the police that he was ordered from the car. The prosecutor was aware that Coleman's and Gray's credibility were material and crucial to the State's case.
The record is clear that both Coleman and Gray testified that the kidnappers ordered Gray to drive off, with Coleman and Gray in the front seat, and the adult kidnappers and the juvenile in the back seat. Gray swore that under the kidnappers' instructions he drove up to Louisa Street to a wooded area, turned into Industry Street, and later into an apartment complex off Higgins Blvd. It was when Gray stopped the car in the apartment complex that Coleman somehow escaped on foot. By this time, according to Coleman, they had "driven around for a good while". This testimony is at complete variance with the police report's record, that Coleman was ordered from the car at the inception of the alleged kidnapping.
Coleman testified at trial that he escaped when they stopped in a parking lot after they had "driven around for a good while." This testimony was directly contradicted by the initial report. According to the Franklin/Charles report, Coleman did not say he drove around with the robbers "for a little while". Instead, he reported to the officers that he was immediately ordered out of the car at Almonaster and Louisa, and immediately abandoned by the kidnappers.
The variance among these statements cannot be overemphasized. Depending on what the jury believed as to when and if Coleman was ordered out of the car, the jury's opinion of Coleman's credibility could be damaged severely. Of equal significance, the statement contained in the police report removes *310 an element of proof of the kidnapping count.[5] The exact language of the Franklin/Charles report is instructive:
Mr. Coleman stated on Sunday 11-14-93 at about 4:44 a.m. his friend (Ramon Gray) stop [sic] for the red light at the intersection of Almonaster Street and Louisa Street. Mr. Coleman further stated three unknown black males approached the vehicle and one of the subjects pointed an unknown type gun at Ramon Gray. The perpetrator with the gun pointed at the driver's head and demanded Levone Coleman out the vehicle. The three perpetrator's [sic] got into the vehicle with the driver (Ramon Grey). Mr. Coleman advised the officers that the vehicle headed Southbound down Louisa Street, then unknown. The passenger (Levone Coleman) walked to the 3400 block of Louisa Street and called the police.

The second report we have now before us after remand, is marked as an Incident and Supplemental Report confected by Officer Len Davis (hereafter Davis Report). Clearly, Oliver was entitled to that report under Shropshire. This report was confected on 14 November 1993 at 9:50 a.m., some five hours after the Franklin/Charles report. In that report Officer Davis spoke with Coleman who stated that he and two of his friends were robbed. Had this report been available to the defense, credibility would have been even more in question now that at trial there were all of a sudden only two victims, when a few hours after the offense there were reportedly three.
Other reports concerning a residence burglary, Oliver's arrest and the alleged possession of a stolen gun are before us but we consider them insignificant as exculpatory impeachment material. The report confected by Officer Gabriel (hereafter Gabriel Report) dated 5 December 1993, however, is highly significant. This report was not available to the defense at trial. The State does not contend that it furnished this report to the defense at any time. In the report Officer Gabriel reports that she was approached by Gray, who stated to her that at the time of the robbery "they ordered his friend (Mr. Levone Coleman) out of his vehicle and ordered him to drive". This report surfaced at the hearing on remand for the first time. Clearly, had this statement been available it would have provided for the opportunity to cross-examine Gray on the question of whether and when Coleman escaped from the car or whether, as Gray had told the police a month after the alleged robbery, Coleman had been ordered from the car at the point of first confrontation (Almonaster and Louisa Streets). It would also form a basis for eliminating one of the kidnapping charges. The suppression of impeachment material again deprived Oliver of the opportunity to challenge Gray's credibility and expose to the jury that Coleman might not have been kidnapped at all.
In light of the fact that Oliver vigorously denied that he robbed and kidnapped Gray and Coleman and testified that he had a sexual relationship with both men for 18 months which had gone sour, credibility was the linchpin of this case. The prosecutor knew this well and stressed this fact in closing argument.
CONCLUSION
Coleman admitted at trial that he was homosexual. Gray admitted that he knew Coleman for three years but denied that he was homosexual. Both Coleman and Gray made statements to the police in temporal proximity to the alleged robbery and kidnapping which were significantly different from their testimony at trial. The case before the jury came to a credibility choice, should they believe the alleged victims or Oliver. Coleman's and Gray's credibility were clearly dependent upon each other's testimony and believability. Had the jury had reason to doubt or disbelieve Gray and Coleman, the outcome may have resulted in an acquittal.
It is with this in mind, that the absence of exculpatory impeachment material left little room to expose the truth of the incident and the circumstances under which Coleman was released. To make matters worse, in the prosecutor's closing argument special mention *311 was made of Gray's credibility. The prosecutor pointed out to the jury that Oliver's brother had alleged that he had dated Ramon Gray, but that Gray's testimony that he had no homosexual relationships should be believed in preference to Oliver's testimony. He commented:
He's [Gray] the most credible individual. In fact, I've known him a long time.
Although the court sustained a defense objection to this impermissible personal veracity guarantee, the prosecutor continued vouching for Gray's credibility in closing argument, saying "Now again, I won't insult you by taking up your time." (A motion for mistrial was denied by the court).
Cumulatively, the inability of defense counsel to cross examine the victims using what the prosecutor had to know were statements of significant, material divergence from their trial testimony and the prosecutor's vouching for Gray's credibility denied Oliver his constitutional right to a fair trial. The facts revealed in the initial police report undermine the state's presentation. Three suppressed police reports could have given rise to vigorous challenges of the alleged victims' credibility, and eliminated any credible proof of an element of the kidnapping offense.
Oliver was convicted and sentenced on two Second Degree Kidnapping charges consecutive to a sentence on the armed robbery charge as a multiple felony offender to 99 years in the Department of Corrections at hard labor, without probation, suspension and parole. The consequences of these convictions are grave. The jury was entitled to know of the alleged victims' contradictory versions of Coleman's alleged escape, and Oliver had the right to present a full case with the proper cross examination tools available to him and his counsel.
Kyles v. Whitley, ___ U.S. ___, ___, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995) teaches us that the impact of the prosecution's withholding favorable evidence and other prosecutorial misconduct must be considered collectively. Here crucial impeachment evidence was withheld depriving Oliver of the opportunity to exculpate himself. Without the requisite police reports, there could be no "verdict worthy of confidence." Kyles, ___ U.S. at ___, 115 S.Ct. at 1566; See also State v. Knapper, 579 So.2d 956 (La.1991). Oliver's failure to request the reports or the transcript of the motion hearings did not relieve the prosecution of its obligation. In U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), our highest Court disavowed any difference between exculpatory and impeachment evidence for Brady purposes; Bagley held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defendant, the result of the proceedings would have been different." 473 U.S. at 682, 105 S.Ct. at 3383 (opinion of Blackmun, J.,) Id. at 685, 105 S.Ct. at 3385 (White, J., concurring in part and concurring in the judgment).
While the prosecution suggests that there was overwhelming evidence of Oliver's guilt and that the divergent statements are without impact on the result because they were merely "incomplete", in our view the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence. We do not consider the withholding of the exculpatory impeachment evidence as harmless error. Oliver's showing of materiality does not require demonstration by the preponderance of evidence that disclosure of the suppressed evidence would have resulted ultimately in his acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate Oliver). Bagley, 473 U.S. at 682, 105 S.Ct. at 3383-3384. Oliver need not demonstrate that after discounting the inculpatory evidence, there would not have been enough left to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that favorable evidence could reasonably put the whole case in such a different light as to undermine confidence in the verdict.
We do not require that the prosecutor have an open file policy but, in our view, the prosecution has a duty to comply with Bagley *312 and the ABA Standards for Criminal Justice which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate. See ABA Standards for Criminal Justice, Prosecution Function and Defense Function 3-3.11 (3d. ed. 1993):
A prosecutor should not fail to make timely disclosure to the defense, at the earliest feasible opportunity, of the existence of all evidence or information which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused.
In this case, disclosure of the withheld reports to competent counsel may have made a different result possible. Since the essence of the State's case was the testimony of Gray and Coleman, the alleged victims who identified Oliver as one of the robbers and kidnappers, disclosure of their prior statements and vigorous cross examination may have substantially reduced or destroyed their credibility.
ACCORDINGLY, we reverse the conviction and the sentence of Alfred Oliver and remand this case for a new trial.
CONVICTIONS AND SENTENCES REVERSED. CASE REMANDED FOR NEW TRIAL.
SCHOTT, C.J., dissents and files opinion.
SCHOTT, Chief Judge, dissenting.
An analysis of the majority opinion shows that only two discrepancies emerge from the numerous reports and statements described in the opinion, one regards the time and circumstances of Coleman's exit from the car and the other regards which of the perpetrators had the gun at various times when Gray was being kidnapped and robbed.
I respectfully submit that my colleagues are making a serious error in their discussion about the effect of the failure of disclosure or the withholding of the so called exculpatory impeachment evidence. In reaching the conclusion that the withholding of the exculpatory impeachment evidence was not harmless my colleagues apply the test that disclosure of the withheld reports may have made a different result possible and disclosure of the prior statements, coupled with cross examination on the basis of those statements, may have destroyed the credibility of the victims.
The test is not whether a different result was possible. Anything is possible. The test as found in the Bagley case is whether a different result was reasonably probable had the material been available to the defense.
When the correct test is applied to this case a reasonable probability may exist that defendant would have been acquitted of kidnapping Coleman because of the discrepancies concerning when and under what circumstances he left the group of perpetrators and the automobile.
On the other hand there is no reasonable probability that the availability of the statements to the defense would have resulted in acquittals of the kidnapping and robbery of Gray. Whether Coleman was kidnapped or not the evidence is overwhelming that defendant and his confederates held Gray against his will over an extended period of time. The discrepancy as to when defendant had the gun is of no consequence. The three were all principals to the crimes, the jury would have been so instructed, and they would have returned verdicts convicting defendant of these two crimes regardless of the minor discrepancies in the statements.
NOTES
[1] a) Incident Report confected by Officers Franklin and Charles, reported on 14 November 1993, via dispatcher. Ramon Gray reports to the police. This report was attached without stamp or exhibit number to the original record.

b) Supplemental Report confected by Detectives Harris and Andry, reported on 11 January 1994. This report was obtained by counsel for the defendant through a public records request. This report is most likely the one referred to obliquely by Officer Sislo during the hearing on pre-trial motions.
The following documents were produced at the remand hearing:
c) Incident/Supplemental Report confected by Officer Len Davis, reported on 14 November 1993. Levon Coleman is the reporter.
d) Supplemental Report confected by Officer Vera Gabriel, reported on 5 December 1993. Ramon Gray is the reporter.
e) Incident Report confected by Lt. Julia Wells of the Levee Board Police, reported on 6 December 1993 concerning a residence burglary.
f) Supplemental Report confected by Officers Nevil and Sislo, reported on 7 December 1993, after review of Officer Len Davis' report. Levone Coleman is the reporter.
g) Supplemental Report confected by Officers Harris and Andry, reported 14 January 1994, detailing Oliver's arrest.
h) Copy of a record of the Orleans Indigent Defender Program with the notation that "No O.I.D.P. file exists. Sherry Watters has her own file".
i) Copy of a New Orleans Police Department Evidence/Property Card No.042682, pertaining to a line-up involving Oliver.
j) Copy of a New Orleans Police Department Evidence/Property Card No.043964 pertaining to property seized from the defendant at the time of his arrest.
[2] State v. Shropshire, 471 So.2d 707 (La. 1985) entitles Oliver to the incident report, and U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) entitles him to the impeachment/exculpatory material.
[3] We are left to guess whether there was any transfer of underlying trial material from Linder to Scaccia at all, because at the hearing on remand initial appellate counsel had no notes from the trial itself and could not find any file pertaining to the Oliver trial. Trial attorney Scaccia, an experienced attorney with thirty-five years in practice testified at the hearing on remand that he had been hired by the Orleans Indigent Defender Board on 13 May 1994, ten days before trial, to replace Linder, who had been reassigned elsewhere.
[4] La.C.Cr.P. art. 297 mandates that "After the preliminary examination, unless the court has ordered the release of the defendant upon a finding that there is not probable cause to charge him with an offense, the court shall transmit, without delay, to the clerk of the court having jurisdiction of the offense: (1) The transcript of the testimony of the witnesses, including that of the defendant if he testified; (2) The order rendered after the examination, or a certified copy thereof...."

The Official Revision Comment notes inter alia that other states variously require that the items be transmitted "without delay", "immediately", "forthwith", or "within ten days after the examination", which indicates the importance of the transmission.
[5] La.R.S. 14:44.1 B.(1) Second Degree Kidnapping defines kidnapping as 1) the forcible seizing and carrying of any person from one place to another.