702 A.2d 699

**Darris Alaric WARE**

v.

**STATE of Maryland.**

**No. 42, Sept. Term, 1996.**

Court of Appeals of Maryland.

Nov. 18, 1997.

Julia Doyle Bernhardt, Asst. Public Defender, Nancy S. Forster, Asst. Public Defender, Stephen E. Harris, Public Defender, on brief, Baltimore, for appellant.

Gwynn X. Kinsey, Jr. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI *, RAKER and WILNER, JJ.

RAKER, Judge.

This case is a direct appeal from a sentence of death imposed by a jury. Md.Code (1957, 1996 Repl.Vol., 1997 Supp.) Article 27, § 414.[1] Appellant Darris Ware was convicted by a jury in the Circuit Court for Howard County of two counts of first degree murder for the murders of Bettina Krista Gentry and Cynthia Allen. The same jury then sentenced him to death. Ware raises eight issues for our review.

I. Did the State's failure to disclose information concerning Edward Anderson, a State's witness with a pending motion for reconsideration of sentence in an unrelated case, violate the State's constitutional obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and deprive Ware of a fair trial?

II. Did the trial court erroneously instruct the jury concerning the need for unanimity on the portion of the verdict sheet that asks whether the State has proven that the aggravating circumstances outweigh the mitigating circumstances?

III. Did the trial court err in accepting written victim impact statements that had been submitted to the Division of Parole and Probation by the State's Attorney's office?

IV. Did the trial court err in denying Ware's request to introduce a tire iron as demonstrative evidence during the testimony of a defense witness who testified she saw Ware holding an item matching the description of the tire iron?

---

* Karwacki, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

1. Unless otherwise specified, all statutory references herein shall be to Maryland Code (1957, 1996 Repl.Vol., 1997 Supp.) Article 27.

V. Did the trial court err by allowing the State to cross-examine defense witness Antonio Barnes concerning money that Ware told Barnes was buried in the backyard of the Gentry home?

VI. Did the trial court err in refusing to voir dire the jurors during its sentencing deliberations concerning a contact between a juror and police officers that Ware claimed he saw while being transported from the courthouse to the detention center?

VII. Did the trial court err in overruling Ware's objections to the prosecutor's closing argument at sentencing?

VIII. Did the trial court err in rejecting Ware's claim that irregularities in the jury's sentencing determination required setting aside the sentence of death?

## I.

On December 30, 1993, eighteen year old Bettina Krista Gentry (Kristi)[2] was found dead in her home. When the emergency personnel arrived, Kristi's friend, twenty-two year old Cynthia Allen (Allen), was injured but still alive. Allen subsequently died from her injuries. Both women had suffered gunshot wounds.

Ware and Kristi Gentry had dated since 1992 and were engaged to be married.[3] Ware visited the Gentry home on the morning of December 30, 1993. Much of what is known about that morning comes from a series of telephone calls to and from the Gentry household. While Ware was at the Gentry home that morning, Kristi received a phone call from her friend Adrian Washington. Adrian Washington testified that

---

**2.** Throughout this opinion, we shall refer to Bettina Krista Gentry as "Kristi," the name the parties used throughout trial, rather than by her last name to avoid confusing her with her mother or brother.

**3.** Kristi's mother, Nina Gentry, testified that the relationship between her daughter and Ware had begun to sour in September, 1993, and that ultimately Kristi told Ware that the relationship was over. Ware, however, referred to Kristi Gentry as his fiancee in his conversations with detectives.

he spoke to Kristi twice that morning and that both times she sounded "scared," "shaky," and "desperate." Immediately after finishing the conversation with Kristi, Adrian Washington received a phone call from a man with an "angry" voice who threatened him. Washington testified that he heard Kristi's voice in the background during this conversation. Adrian Washington then called his brother, Thomas Washington, and described his phone conversations with Kristi. Thomas Washington called the Gentry residence and he testified that Kristi sounded upset when he spoke with her. Kristi told Thomas Washington that Ware and she had been fighting and arguing and that Ware would not leave the house. Thomas Washington then asked to speak with Ware and told him to leave the Gentry house.

At approximately 10:30 a.m., Thomas Washington called Kevin Gentry, Kristi's brother, at work. Kevin Gentry left work and went to the house of his mother and sister immediately after receiving Thomas Washington's call. Ware answered the door at the Gentry residence. Kevin Gentry then beat him and threw him out of the house. Kevin Gentry testified that after he threw Ware out of the house, Ware took a gun from his Jeep and pointed it at Kevin Gentry. In Ware's statement to the detectives after his arrest, however, he stated that he had instead thrown a crowbar at Kevin Gentry in self-defense. Other witnesses testify that they saw Ware near the Gentry home holding a long, dark object. Kevin Gentry and Ware encountered one another again on the road leaving the Gentry home. Kevin Gentry testified that Ware approached Gentry's car with a gun. A fifteen year old neighbor who was outside shoveling snow witnessed the altercation between Kevin Gentry and Ware and testified that it occurred sometime between 11:00 a.m. and noon. After the fight, the witness saw Ware go inside the Gentry home, and shortly thereafter, he saw Kristi and a friend also enter the Gentry home.

The events inside the Gentry home are revealed as a result of a telephone conversation. Edward Anderson was incarcerated at the Maryland House of Corrections Annex on Decem-

ber 30, 1993. Anderson knew both Kristi and Allen. Allen was the mother of Anderson's six-year-old daughter, and Kristi had recently visited Anderson in prison. Anderson testified that he called the Gentry home about noon on December 30[4] and that Allen answered the telephone. Allen informed Anderson that Ware was at the Gentry house. A few minutes later Kristi began to scream, and Allen asked Anderson to hold while she checked on Kristi. Anderson testified that Allen then returned to the phone and explained to him that Darris and Kristi were "fussing." Anderson and Allen continued their conversation for about five minutes longer when Allen again told Anderson to hold while she checked on Kristi. After Allen left the phone the second time, Anderson testified that he heard screaming in the background and then heard three gunshots—two in rapid succession, then a pause lasting between ten and thirty seconds, and then a third shot. Allen never returned to the phone and the phone was "hung up" about thirty seconds later. Anderson then telephoned friends who lived nearby to tell them that he heard gunshots at the Gentry residence and to ask them to go immediately to the Gentry home to make sure everything was alright. Clyburn Cunningham, Jr., who was staying in a house nearby, went to the Gentry home and knocked on the door. No one answered the door and Cunningham did not see anything askew through the windows.

Nina Gentry, Kristi's mother, discovered Kristi and Allen when she returned home from work at approximately 1:30 p.m. Police and rescue workers arrived shortly thereafter and transported Allen, who was still alive, to the hospital. While the police were at the Gentry home, Ware telephoned and spoke with a police officer, Officer Knight, who told him that he should come to the Gentry home to speak with the officers. Officer Knight then spoke with Kevin Gentry, who told him where Ware lived. Officer Knight was leaving the

---

**4.** The telephone records from the prison confirm that Anderson placed an outgoing call to the Gentry's telephone number on December 30, 1993 at 12:01 p.m. The call lasted thirty minutes.

Gentry residence to go to Ware's apartment when he encountered Ware approaching the Gentry home in his Jeep. Officer Knight stopped the Jeep and arrested Ware. We shall supply additional facts relevant to the resolution of this appeal as necessary throughout the opinion.

The Grand Jury for Anne Arundel County indicted Ware on two counts of first degree murder, two counts of use of a handgun in the commission of a felony, and two counts of use of a handgun in the commission of a crime of violence. The State filed notice of intent to seek the death penalty, *see* Md.Code (1957, 1996 Repl.Vol., 1997 Supp.) Art. 27, § 412(b), and the case was removed to the Circuit Court for Howard County for trial. Md. Rule 4–254(b)(1). On September 11, 1995, the jury returned verdicts of guilty on all counts. Sentencing began on October 2, 1995, and the same jury sentenced Ware to death for each count of first degree murder. The court also imposed two twenty year sentences for use of a handgun in the commission of a felony. This appeal followed.

II. The *Brady* Issue

A.

Ware's first contention is that his trial was unfair because the State failed to disclose material, exculpatory evidence under *Brady v. Maryland,* 373 U.S. at 86, 83 S.Ct. at 1196, and a new trial is required. We agree.

In February 1994, Ware filed his first Request for Discovery and Motion to Produce Documents.[5] In that discovery motion, he requested, *inter alia,* disclosure of

[t]he existence, substance and the manner of execution or fulfillment of any promises, inducements, agreements, rewards, understandings or arrangements, either verbal or written, to any witness including but not limited to any

---

5. Ware's motion was based on Maryland Rule 4–263(a) as well as the disclosure requirements articulated in *Brady v. Maryland* and its progeny. Citing *Gilliam v. State,* 331 Md. 651, 686, 629 A.2d 685, 703 (1993), appellant elected to treat both alleged violations together. We shall do the same.

of the following agreements: ... (5)[t]o assist in any way any witnesses' ability to obtain a favorable ruling on any motion for modification of sentence which is presently pending or will be filed at a future date on any case....

Ware received no response from the State. In late November 1994, Ware filed a Supplemental Discovery Motion to Compel Disclosure of Existence and Substance of Promise of Immunity, Leniency or Preferential Treatment Offered to Any State's Witness. The supplemental motion contained the same request as the original discovery motion. On December 8, 1994, Judge Lawrence Rushworth held a hearing in the Circuit Court for Anne Arundel County to address Ware's pre-trial motions. The parties specifically addressed Ware's request to compel disclosure of any agreements between the State and any of its witnesses. Ware's counsel expressed particular concern about Edward Anderson, who defense counsel knew was serving a life sentence for first degree murder. The following exchange occurred:

> [DEFENSE COUNSEL]: There's a particular concern in this case, Mr. Edward Anderson who I've spoken to before is currently serving a life-plus-ten sentence in Jessup for first-degree murder and as I indicated, I do believe that the State is planning on calling that person.
> THE COURT: The motion is to exclude the testimony?
> [DEFENSE COUNSEL]: No, sir. It is to disclose ... any deals that ...
> THE COURT: Any deals.
> [DEFENSE COUNSEL]: Essentially. And it is on grounds that I'm sure this court is very familiar with based on its own practice. It's *Brady* grounds essentially. The question is whether there is—whether there is any information which ... would indicate that Mr. Anderson is selling testimony, for lack of a better shorthand phrase.
> THE COURT: State?
> [THE STATE]: It's ... counsel's primary goal to keep him from testifying in this case. So again, ... my point

is that it's a moot issue at this time because he has not been called to testify in this case. Certainly if he does testify, he's subject to crossexaminations as to any kind of motives or ... reasons for testifying in the manner in which he did, and information that the counsel has requested is not covered by the rules of discovery, which have been complied with ... by the State in this case.

And ... for those reasons ... it's a moot issue at this point, he has not become a witness.

[DEFENSE COUNSEL]: It's not moot at this point, your Honor, because ... this guy is going to be a witness of some kind, and if the State is giving him leniency in his current life term, and that is certainly information which the defense is entitled to for purposes of cross-examination.

Now, they know whether they've offered him anything or not to date and ... if the State indicates that they have not, then I will certainly renew my request at the time of trial. But I'm trying to determine whether anything has been offered at this point.

THE COURT: Then ... it's addressed by *Brady* ... if the State has made a deal and isn't forthcoming with that information, there are sanctions.

[THE STATE]: But, your honor, ... *Brady* deals with exculpatory information; and exculpatory information is information that, number one, is indicative that the defendant did not commit the crime, or innocent, or that would mitigate punishment in the case.

*What I have already indicated on many, many occasions that I'm unaware of any evidence at the present time that would be deemed exculpatory or would mitigate punishment under relevant state and federal case law and the statutes. And that's the State's representation in this case.*

What may have been said to this witness or another witness or any witness and how that might be construed by Mr. Blumberg or by the court or by me or by anyone

else is a matter of conjecture for anyone. But—but the point is *I've made a representation that I know of no exculpatory information or information that would mitigate punishment under Brady;* and as the court has indicated, you know, there are sanctions that are clearly for that.

Again, we're going on a fishing expedition here, wanting to know basically not just Mr. Anderson, but any witness in this case, what—you know, ... whose interpretation of what is said to someone and what it means is—is up for anyone to ... figure out. If Mr. Anderson or another witness takes the stand, Mr. Blumberg is free to inquire as to any promises, threats, inducements, or anything along those lines ...

The circuit court denied the motion to compel disclosure of any agreements with Edward Anderson.

The issue of agreements or understandings with Anderson arose again before the cross-examination of Anderson at Ware's trial. Defense counsel again requested "to be provided with any offers of leniency to Mr. Anderson by the State in exchange for his testimony." The court then asked the prosecutor whether there were any such offers of leniency, and Gerald Anders, the Assistant State's Attorney prosecuting Ware's case, replied:

The only statements made to the witness, Your Honor, was that if he in fact testified in this case and was placed in any type of danger in the House of Correction because of his testimony, that I would do what I could to protect him by putting him in isolation or protective custody.

To clarify Anders's statement the court asked, "So that's the only agreement, to your knowledge, that's been reached?" Anders replied, "Yes, sir." The defense cross-examined Anderson, which did not include any questions about Anderson's pending motion for reconsideration of sentence.

We take our account of the facts surrounding Anderson's motion for reconsideration from the hearing on Ware's motion for a new trial. Edward Anderson is serving a life sentence

for an unrelated murder. In January 1994, he. contacted Tania Porter, an attorney, seeking representation in his efforts to get his life sentence modified. When Porter first met with Anderson in May 1994, he informed Porter that he would be testifying for the State in Ware's upcoming trial and, as a result, that he feared for his safety in prison. Upon learning of her client's cooperation in Ware's ˙ case, Porter filed a Supplemental Motion for Reconsideration of Anderson's life sentence [6] in the Circuit Court for Baltimore County and contacted Gerald Anders. She asked Anders to write a letter to James Gentry,[7] the Baltimore County Assistant State's Attorney handling Anderson's sentence modification, to explain that Anderson was testifying in the Ware trial. The letter from Anders to Gentry is dated December 7, 1994, and states in pertinent part:

> Mr. Anderson has come forward voluntarily to provide information in this case, has appeared before the Grand Jury and has agreed to testify at trial despite the considerable risk which this entails for one incarcerated. No promise or inducements have been made to him and I feel he has been honest and truthful in this matter in every respect.

Out of concern for her client's safety, Porter did not attach Anders's letter to her motion for reconsideration. Porter also wrote a letter to the trial judge, Judge Joseph F. Murphy, now Chief Judge of the Court of Special Appeals, before whom Anderson's motion for reconsideration of sentence was pending.[8] She informed Judge Murphy that Anderson had testi-

---

6. Porter filed a supplemental motion because Anderson's original attorney had filed a motion for reconsideration within 90 days of Anderson's conviction in 1990.

7. James Gentry is no relation to Kristi Gentry.

8. Judge Joseph F. Murphy presided over Anderson's trial and sentencing in 1990. He was appointed to the Court of Special Appeals in 1993. He was cross designated by the Court of Appeals to sit as Judge of the Circuit Court, and he apparently returned to the Circuit Court for

fied before the grand jury in the Ware matter and that he had agreed to testify at trial. To protect his safety, she asked that the letter not be made part of Anderson's court file, and the court agreed to exclude the letter from the file.

Judge Murphy held a hearing on Anderson's motion for reconsideration of sentence on April 19, 1995. Porter, Anderson's counsel, questioned Anderson at the hearing concerning his involvement in the Ware case. Anderson testified that he had been on the telephone when a double homicide occurred at the residence he had called. He also stated that he had testified before the grand jury and had agreed to testify at trial as well. In response to the question "What did you do when you heard the shots?" Anderson replied:

> I—I just reacted in—did what any normal person would do. I got off the phone. I called back and there was no answer so I called someone that lives close by and told them to call the police *I just heard two gunshots.*

Anders also testified at the hearing, and stated that Anderson was a State's witness in a death penalty case he was prosecuting and that Anderson would testify that he heard *two* shots during the telephone conversation.[9] At the close of the hearing, the court ruled as follows:

> My decision today is to be granted in part, . . . but I will reserve in part as well. I want to know what happens at the case Mr. Anders is prosecuting when this goes [to] trial in the Circuit Court for Anne Arundel County. . . . [W]e can look at this again after the case in Anne Arundel County. Mr. Anders's position may be a little different when Mr. Anders hears what his position, his position may be a little different. I'm not saying it ought to be, I'm simply saying it might be.

After the hearing, Porter testified that Anders phoned her and told her that she did a good job. Because Anders left the

---

Baltimore County to hear Anderson's Supplemental Motion for Reconsideration of Sentence.

**9.** At trial, Anderson testified that he heard three shots, not two.

hearing before the end, Porter informed him that the court had held the matter *sub curia* pending the conclusion of the Ware trial. In subsequent conversations, Anders and Porter discussed arrangements to have Anderson moved from Jessup to the Frederick County Detention Center pending Ware's trial. Porter testified that Anders offered to prepare the pleadings necessary to accomplish Anderson's transfer, which he then faxed to her.

On October 10, 1995, after Ware had been convicted and sentenced to death, Anders wrote a letter to Judge Murphy upon Porter's request. Anders wrote, in pertinent part:

> Mr. Anderson appeared as a State witness in State v. Darris Alaric Ware ... and was truthful and cooperative in every respect. Mr. Ware was convicted of two counts of first degree murder and sentenced to death.
>
> If I can provide any further information or can be of any assistance, please let me know at your convenience.

In November 1995, Ware's counsel learned that Anderson's motion for reconsideration of sentence was pending at the time he testified against Ware. Ware then supplemented his motion for new trial[10] with the additional ground that the State violated its obligations under *Brady v. Maryland* in failing to disclose exculpatory evidence when it failed to disclose any of the information regarding the State's involvement in Anderson's pending motion for reconsideration of sentence. In considering Ware's motion for a new trial, the trial court ruled that "there was an understanding, an arrangement, or an agreement that the State would provide a favorable report to Judge Murphy should Mr. Anderson testify, in Mr. Anders's view, in a truthful and cooperative fashion, and that the report would be forwarded on to Judge Murphy." The court's ruling was based on several facts: (1) that Judge Murphy deferred ruling on Anderson's motion for reconsideration until

---

**10.** At the time Ware's counsel learned of Anderson's pending motion for reconsideration of sentence, counsel had already filed on Ware's behalf a motion for a new trial. The substance of this motion for a new trial is not relevant to our analysis.

after Anderson testified at Ware's trial, (2) that Judge Murphy would receive a report commenting on Anderson's testimony, and (3) that Anders, the Assistant State's Attorney prosecuting Ware, would participate in either making the report or evaluation that could determine Mr. Anderson's fate. The trial court wrote:

> [T]here is here an ongoing year-long relationship among the witness, his defense counsel, and the prosecutor, in which the prosecutor's actions of helpful letters, testimony, and security assistance, coupled with the manner in which the Circuit Court for Baltimore County left the reconsideration pending until after the *Ware* trial, created the understanding, arrangement, or agreement the Court has found in this case.

The trial court nevertheless denied the motion for a new trial. The court found that most of the information that was allegedly suppressed was "readily available" to Ware through "diligent investigation." Hence, the court reasoned, there was no *Brady* violation as to the nondisclosed material. The court found that the State had suppressed information concerning the understanding, arrangement, or agreement between Anderson and the State, but the court could not conclude "that the suppression of this fact—the fact of the agreement—creates a 'reasonable probability' of a different result or that this evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." The trial court reasoned that the State's evidence was overwhelming; that the "central essence" of the nondisclosed agreement "would have been fully before the jury" through the available information that defense counsel did not present; and that "chipping further away at the edges of Edward Anderson's testimony by use of the suppressed agreement would likely only have opened the door for an impressive rehabilitation of his testimony." Although the court denied Ware's motion for a new trial, Judge Sweeney commented:

> While the Court retains full confidence in the jury's verdict and sentence, the Court believes it is highly unfortunate that the prosecutor in this case, apparently

ignorant of the nuances of modern *Brady* law, employed a pinched and myopic view of what constitutes an agreement when responding to the Court's inquiry. While this Court has determined that a new trial is not warranted, the prosecutor's error will undoubtedly cast a troubling cloud over this case until its ultimate conclusion. By "tacking too close to the wind," [11] the State has unnecessarily tainted the conviction and death sentence it worked so hard to obtain.

## B.

Ware maintains that the State's failure to disclose the information surrounding Edward Anderson violated its *Brady* obligations and deprived him of due process. Ware contends that the State had a duty to disclose the following information: (1) that there was a motion for reconsideration of sentence pending for Edward Anderson; (2) that the Assistant State's Attorney, Gerald Anders, testified on Anderson's behalf at the hearing on the motion for reconsideration; (3) that the circuit court judge in Baltimore County presiding over Anderson's motion for reconsideration held Anderson's motion for reconsideration *sub curia* pending the outcome of Ware's trial; (4) that Anderson's testimony at his sentence modification hear-

---

**11.** Justice Souter spoke of the prosecutor "tacking too close to the wind" in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Justice Souter wrote:

[A] prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. *See [United States v.] Agurs*, 427 U.S. [97,] 108, 96 S.Ct. [2392,] 2399–2400 [49 L.Ed.2d 342 (1976) ]("[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure"). This is as it should be. Such disclosure will serve to justify trust in the prosecutor as the 'representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done.' *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations. *See Rose v. Clark*, 478 U.S. 570, 577–578, 106 S.Ct. 3101, 3105–3106, 92 L.Ed.2d 460 (1986).

*Id.* at 439–40, 115 S.Ct. at 1568–69.

ing was inconsistent with his trial testimony regarding the number of gunshots he heard over the telephone; and (5) that there existed an implied promise of assistance by prosecutor Anders to Edward Anderson. Ware argues that the failure to disclose this information was material and that this information, if used at trial, would have had a substantial effect on Anderson's credibility, and could have caused the jury to disbelieve Anderson, or "at the very least, the suppressed evidence regarding the differing number of shots could have meant the difference between first and second degree murder as to Kristi Gentry."

The State, on the other hand, contends that *Brady* does not require the State to disclose this information because it was reasonably available to the defense through the exercise of due diligence. According to the State, the prosecutor's response to Ware's requests for information about agreements with Anderson should have alerted the defense of the need to continue its independent investigation of any judicial proceedings against Mr. Anderson.[12] The State further argues that because there was ample evidence that Ware was the perpetrator of the murders and that the killings were premeditated, the undisclosed information was not material.

### C.

In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. *See also Bloodsworth v. State*, 307 Md. 164, 175, 512 A.2d 1056, 1061 (1986); *Brady v. Maryland*, 226 Md. 422, 430, 174 A.2d 167, 171 (1961). There is no distinction between exculpatory evidence and impeachment evidence.

---

12. The State concedes that the prosecutor misconstrued *Brady* as not applying to impeachment evidence. The State argues, however, that this "merely underscores the conspicuously limited scope of the prosecutor's affirmative representation at the December 8, 1994 hearing."

*United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (holding that a prosecutor's failure to correct false testimony violates due process even when the testimony relates solely to a witness's credibility).

 To establish a *Brady* violation, the defendant must establish (1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense—either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness—and (3) that the suppressed evidence is material. *United States v. Bagley,* 473 U.S. at 674–78, 105 S.Ct. at 3379–81; *Giglio v. United States,* 405 U.S. at 153–54, 92 S.Ct. at 766; *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196. The failure of the prosecutor to disclose favorable, material evidence violates due process without regard to the good faith or bad faith of the prosecutor. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–1197. "Moreover, whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766. This obligation was summarized in *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2400–01, 49 L.Ed.2d 342 (1976):

> "[T]he constitutional obligation is [not] measured by the moral culpability, or the willfulness, of the prosecutor. If evidence highly probative of innocence is in his file, he should be presumed to recognize its significance even if he has actually overlooked it. . . . If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."

### Suppression of Evidence by the State

 In *United States v. Bagley,* 473 U.S. at 675, 105 S.Ct. at 3380, the Supreme Court explained that the *Brady* rule was not intended "to displace the adversary system as the primary

means by which truth is uncovered." Accordingly, the *Brady* rule does not relieve the defendant from the obligation to investigate the case and prepare for trial. The prosecution cannot be said to have suppressed evidence for *Brady* purposes when the information allegedly suppressed was available to the defendant through reasonable and diligent investigation. *See, e.g., Hoke v. Netherland,* 92 F.3d 1350, 1355 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 630, 136 L.Ed.2d 548 (1996). *Brady* offers a defendant no relief when the defendant knew or should have known facts permitting him or her to take advantage of the evidence in question or when a reasonable defendant would have found the evidence. *See United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995), *cert. denied,* 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996); *Barnes v. Thompson,* 58 F.3d 971, 975 (4th Cir.1995) (holding that no *Brady* violation exists when exculpatory evidence is available to the defendant from a source where a reasonable defendant would have looked); *see also United States v. Kelly,* 35 F.3d 929, 937 (4th Cir.1994).

■ Merely because evidence is available through public records, however, does not necessarily mean that it is available to the accused for purposes of determining whether the *Brady* rule applies. As the United States Court of Appeals for the Fourth Circuit has noted, "there is no general 'public records' exception to the *Brady* rule." *Chavis v. North Carolina,* 637 F.2d 213, 225 (4th Cir.1980). Even when the exculpatory information can be found in public records, the necessary inquiry is whether the defendant knew or should have known facts that would have allowed him to access the undisclosed evidence. *Payne,* 63 F.3d at 1208. Furthermore, the existence of evidence in the public record does not suffice to relieve the State of its duty to disclose material, favorable evidence to the defense unless a reasonable defendant would have looked to that public record in the exercise of due diligence. *Kelly,* 35 F.3d at 937 (holding that exculpatory evidence not reasonably available as a public record when the document was not filed until the day on which the defense rested its case).

The case of *United States v. Payne*, 63 F.3d at 1205, is factually similar to the instant case. In *Payne*, the government did not disclose to the defense an affidavit of a State's witness, Wilkerson, who had pled guilty to narcotics charges arising out of the same activity for which Payne was indicted. In an affidavit, submitted to the trial court prior to her guilty plea, Wilkerson stated under oath that she "never entered into any conspiracy to sell or possess narcotics with anyone" and that she had "never sold any narcotics." *Id.* Wilkerson subsequently pled guilty to distribution and possession with intent to distribute crack and possession of firearms in connection with drug trafficking. *Id.* At Payne's trial, she testified that Payne had lured her into the drug trade and that she was only selling drugs to put herself through school. *Id.* at 1206. The defense was not aware of Wilkerson's prior statement under oath that she had never sold drugs. The government in *Payne* contended that it had no duty to disclose the Wilkerson affidavit because it was in public court records to which Payne had access. The Second Circuit rejected this contention. Noting the established rule that "documents that are part of the public records are not deemed suppressed if defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation," *id.* at 1208, the Second Circuit concluded that Payne had no reason to believe that Wilkerson had filed an affidavit nor did he have any indication of facts that would have required him to discover the affidavit. *Id.* at 1209. Accordingly, the court held that "the government had suppressed the Wilkerson affidavit within the meaning of *Brady.*" *Id.*[13]

### Favorable to the Accused

■ In addition to establishing that the State suppressed evidence, the defendant must also prove that the evidence is favorable to the accused. *Brady,* 373 U.S. at 87, 83 S.Ct. at

---

**13.** The Second Circuit in *United States v. Payne,* 63 F.3d 1200, 1210 (2d Cir.1995) held that the suppressed evidence was not material because "Wilkerson's testimony was but a fraction of the evidence linking Payne to narcotics dealing." *Id.* at 1210.

1196. Favorable evidence includes not only evidence that is directly exculpatory, but also evidence that can be used to impeach witnesses against the accused. *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766.

■ Evidence that the State has entered into an agreement with a witness, whether formally or informally, is often powerful impeachment evidence and the existence of such a "deal" must be disclosed to the accused. S*ee Marshall v. State*, 346 Md. 186, 198, 695 A.2d 184, 190 (1997); *Giglio*, 405 U.S. at 153–54, 92 S.Ct. at 766; *see also United States v. Smith*, 77 F.3d 511, 516 (D.C.Cir.1996). The importance of such evidence was underscored by the United States Supreme Court in *Napue v. Illinois*, 360 U.S. at 269, 79 S.Ct. at 1177:

> The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

In *Giglio,*the Supreme Court made clear that the prosecutor's duty to disclose applies to *any* understanding or agreement between the witness and the State. *Giglio*, 405 U.S. at 155, 92 S.Ct. at 766. Moreover, an agreement or understanding between the witness and the State need not be formal or detailed to come within the prosecutor's duty to disclose. *Id. See, e.g., Reutter v. Solem*, 888 F.2d 578, 582 (8th Cir.1989); *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir.1986) (holding that "facts which imply an agreement would also bear on [the witness's] credibility and would have to be disclosed"); *Jimenez v. State*, 112 Nev. 610, 918 P.2d 687, 695 (1996) (holding that prosecution had duty to disclose benefits given to witness even though at the time witness agreed to testify no benefits had been given); *Patillo v. State*, 258 Ga. 255, 368 S.E.2d 493, 498 (holding that State should have revealed agreement "no matter how non-promising the agreement was in terms of its prospects for the witness"), *cert. denied*, 488 U.S. 948, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988); *People v. Cwikla*, 46 N.Y.2d 434, 414 N.Y.S.2d 102, 106–07, 386 N.E.2d

1070, 1074 (1979) (holding that despite absence of "express promise" State should have disclosed "strong inference . . . of an expectation of leniency"); *see also United States v. Noriega*, 117 F.3d 1206, 1217–18 (11th Cir.1997) (holding that a State's deal with a non-witness could be material if it reveals hidden motivations behind a witness's testimony).

The United States Court of Appeals for the Eighth Circuit addressed similar facts to the instant case in *Reutter v. Solem*, 888 F.2d at 580–82. In *Reutter*, the government failed to disclose that one of Reutter's co-conspirators, Trygstad, had a petition for commutation of his sentence pending before the Board of Pardons and Paroles at the time he testified against Reutter. *Id.* at 580. One of the members of the parole board scheduled to hear Trygstad's petition was an assistant attorney general assigned to prosecute Reutter's case. *Id.* Trygstad's hearing was initially scheduled to take place on January 27, 1984, but it was delayed for one month. At the February meeting of the Board, Trygstad requested another month's delay. His hearing finally took place on March 22, 1984, the same day that the verdict was returned against Reutter. The Board decided Trygstad's petition favorably and recommended that the Governor entirely commute Trygstad's sentence; the Governor complied. *Id.* The prosecution failed to inform Reutter of Trygstad's pending application for commutation of sentence despite the fact that the court granted Reutter's motion for disclosure of all exculpatory evidence. *Id.* at 581. The Eighth Circuit noted:

> The cross-examination of Trygstad could have been significantly more effective . . . had defense counsel known that Trygstad's hearing had been rescheduled (without explanation) on two occasions and now was set to take place soon after Trygstad's appearance as the state's star witness at petitioner's trial. It is not difficult to discern that the disclosure of this information might have had a substantial impact on the jury.

*Id.* The Eighth Circuit held that the fact of Trygstad's impending commutation hearing was material. *Id.* at 582. The court did not require that there be a formal or informal

agreement between Trygstad and the parole board or the prosecutors in Reutter's case. Instead, the court reasoned:

> Our conclusion does not depend on a finding of either an express or an implied agreement between Trygstad and the prosecution regarding the prosecution's favorable recommendation to the parole board. The District Court found there was no agreement and this finding is not clearly erroneous. The fact that there was no agreement, however, is not determinative of whether the prosecution's actions constituted a *Brady* violation requiring reversal under the *Bagley* standard.

*Id.*

*People v. Cwikla,* 414 N.Y.S.2d at 104–07, 386 N.E.2d at 1072–74 is also factually similar. The prosecutor in Cwikla's case wrote a letter to the State Department of Correctional Services concerning Cox, a witness for the State who had an upcoming parole hearing. *Id.* at 105–06, 386 N.E.2d at 1073. The letter informed the Department that Cox had cooperated in the investigation and prosecution of Cwikla, and that as a result of Cox's cooperation, Cwikla was convicted. The letter also expressed hope that the parole board would keep Cox's cooperation in mind when considering his request for parole. *Id.* The defense requested all correspondence between the district attorney's office and the parole board, but the prosecution refused to turn over any correspondence, nor even acknowledge that any such correspondence existed. *Id.* at 104–05, 386 N.E.2d at 1072. Similar to the Eighth Circuit in *Reutter,* the Court of Appeals of New York concluded that an express promise need not exist in order to impose a duty upon the prosecution to disclose impeachment evidence. The court concluded:

> While in the present case the materials sought by defense counsel do not directly demonstrate the existence of an express promise, there is nonetheless a strong inference, at the very least, of an expectation of leniency which should have been presented to the jury for its consideration. The potential persuasiveness of this inference is suggested by the extent of the misleading and obstructive

tactics employed by the Assistant District Attorney at trial. Accordingly, the failure of the prosecutor to turn over these materials was error which requires reversal of the defendants' convictions and a new trial.

*Id.* at 106, 386 N.E.2d at 1074; *see also Patillo v. State,* 368 S.E.2d at 497–98 (holding that the State should have disclosed an agreement with a witness to write a letter to the judge before whom the witness's revocation of probation was pending, but concluding that evidence of the agreement was not material).

### Materiality of the Evidence

The final hurdle the accused must clear in order to establish a *Brady* violation is materiality. Not all instances of suppression of evidence warrant a new trial. Instead, the suppressed evidence must be material to the guilt or the punishment of the accused in order to violate due process and entitle the defendant to a new trial.

The United States Supreme Court recently explicated, and modified, the standard of materiality in cases of prosecutorial suppression in *Bagley.* The Supreme Court applied the *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), "reasonable probability" test for assessing claims of ineffective assistance of counsel to prosecutorial nondisclosure of information in the context of the *Brady* rule. The Court stated:

> [I]n *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court held that a new trial must be granted when evidence is not introduced because of the incompetence of counsel only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* at 694 [104 S.Ct. at 2068]. . . .
>
> We find the *Strickland* formulation of the . . . test for materiality sufficiently flexible to cover the "no request," "general request," and "specific request" cases of prosecutorial failure to disclose evidence favorable to the ac-

cused: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383.

 This Court discussed the *Brady* materiality requirement in *State v. Thomas,* 325 Md. 160, 190, 599 A.2d 1171, 1185 (1992).[14] In *Thomas,* a death penalty case, the appellant

---

14. Ware argues that the test for materiality which should be applied in this case is the test set out in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), concerning false trial testimony. In *Agurs,* the Supreme Court set out three circumstances in which a prosecutor has a duty to disclose under *Brady,* and articulated a materiality standard for each situation. First, where "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and the prosecution knew, or should have known, of the perjury," the defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397. Second, where the prosecutor fails to disclose specifically requested evidence, the defendant is entitled to a new trial where the suppressed evidence might have affected the outcome of the trial. *Id.* at 104, 96 S.Ct. at 2398. Finally, where the prosecutor fails to disclose evidence in response to a general request, or no request at all, a higher standard of materiality (and one less favorable to the defendant) is required and a new trial is required if the undisclosed information "creates a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2402.

Ware argues that in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court clarified the materiality standard only with respect to the specific request/general request or no request situations, and that the materiality test applicable to the perjured testimony context remains the more defense favorable test as set out in *Agurs. See United States v. Steinberg,* 99 F.3d 1486, 1490 (9th Cir.1996); *United States v. Kelly,* 35 F.3d 929, 936 n. 10 (4th Cir.1994) (noting that because the parties did not raise the issue of whether the standard of materiality may be a lesser standard when the evidence demonstrates that the prosecutor presents false trial testimony, court will not consider the issue); *Ouimette v. Moran,* 942 F.2d 1, 10–11 (1st Cir.1991); *Roberts v. State,* 110 Nev. 1121, 881 P.2d 1 (1994) (citing cases); *People v. Vilardi,* 76 N.Y.2d 67, 556 N.Y.S.2d 518, 555 N.E.2d 915 (1990); *Com. v. Gallarelli,* 399 Mass. 17, 502 N.E.2d 516, 519 (1987) (rejecting the *Bagley* test for materiality);

We need not decide the effect of *Bagley* on the *Agurs* perjured testimony situation, nor need we determine whether any inconsistency

argued that the State's failure to disclose police reports concerning the murder victim's violent criminal activities deprived him of a fair trial. Judge Karwacki, writing for the Court, articulated the applicable standard to determine whether the State's failure to disclose evidence warrants overturning the conviction:

> Evidence is considered material, and relief is therefore appropriate, if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985); *State v. Tichnell*, 306 Md. 428, 462–63, 509 A.2d 1179, 1196–97 (1986), *cert. denied*, 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986), *rehearing denied*, 479 U.S. 1060, 107 S.Ct. 942, 93 L.Ed.2d 992 (1987). In the instant case, we discern no substantial possibility[8] that, had the police reports been revealed to Thomas's counsel, the result of the trial would have been any different.
>
> 8. This standard reflects our interpretation of the "reasonable probability" language employed by the Supreme Court in *Strickland*. *Bowers v. State*, 320 Md. at 426–27, 578 A.2d at 739.

*Thomas*, 325 Md. at 190 & n. 8, 599 A.2d at 1185 & n. 8 (footnote omitted).[15]

---

in Anderson's testimony amounted to perjury, because under any test, we find the undisclosed evidence to be material.

**15.** Similarly, Nevada and several other states articulate the materiality test to assess a *Brady* violation in terms of possibility rather than probability. *See, e.g. People v. Vilardi*, 556 N.Y.S.2d at 523–24, 555 N.E.2d at 920–21. In *Jimenez v. State*, 112 Nev. 610, 918 P.2d 687 (1996), the Nevada Supreme Court explained:

In federal cases, [reasonable probability] is now the standard for requests for specific evidence as well. However, in Nevada and a number of other states a Brady violation occurring after a specific request is material if there exists a reasonable *possibility* that the claimed evidence would have affected the judgment of the trier of fact, and thus the outcome of the trial.

*Id.* 918 P.2d at 692 (citation omitted).

The United States Supreme Court refined the standard for materiality in its most recent pronouncement on the subject. *See Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In *Kyles*, Justice Kennedy, writing for the Court, emphasized four aspects of materiality under *Bagley*. First, a showing of materiality does not require the accused to demonstrate by a preponderance of the evidence that the disclosure of the suppressed evidence would have resulted in an acquittal; rather, the touchstone of materiality is whether the suppression undermines confidence in the outcome of the trial. *Id.* at 434, 115 S.Ct. at 1566. The Court explained:

> *Bagley's* touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* Second, the *Bagley* materiality standard is not a sufficiency of the evidence test in that the defendant need not demonstrate that disclosure of the exculpatory evidence would have left the State with too little inculpatory evidence to convict. *Id.* at 434–35, 115 S.Ct. at 1566. Rather, one shows a *Brady* violation by demonstrating that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* Third, once the materiality standard has been satisfied, a harmless error review is not appropriate, because, by definition, no *Bagley* error could ever be harmless. *Id.* at 435, 115 S.Ct. at 1566. Finally, materiality is considered in terms of the suppressed evidence collectively, not item-by-item. *Id.* at 436–37, 115 S.Ct. at 1567.

D.

We turn now to apply these principles to the alleged *Brady* violation in this case. As Ware raises constitutional claims, our review is *de novo.* We independently evaluate the totality of the circumstances as evidenced by the entire record. *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

"When the prosecutor receives a specific and relevant request," the Supreme Court noted in *Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399, "the failure to make any response is seldom, if ever, excusable." If the failure to make any response is rarely excusable, then certainly a misleading response is seldom, if ever, excusable as well. Ware made more than one specific request for disclosure of any agreements or understanding between the State and Anderson. Although under *Bagley* we no longer distinguish for purposes of determining the standard of materiality among cases in which the defense made a specific request as opposed to a general request or no request at all, the fact that the defendant made a specific request figures into the analysis nevertheless. *See* Note, *Specific Requests and the Prosecutorial Duty to Disclose Evidence: The Impact of United States v. Bagley,* 1986 DUKE L.J. 892 (1986). When the defendant makes a specific request and the State responds that it knows of no such evidence, the defendant is more likely to rely upon that representation and possibly, based on the State's response, forgo avenues of investigation. Justice Blackmun, writing for the Court in *Bagley,* observed that:

> We agree that the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the non-disclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.

*Bagley,* 473 U.S. at 682–83, 105 S.Ct. at 3384. The Court further noted that the nondisclosure in response to a specific request

> not only deprives the defense of certain evidence, but has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.

*Id.* at 682, 105 S.Ct. at 3384.

We reject the State's argument that the information concerning the State's role in Anderson's motion for reconsideration of sentence was available to the defense through the exercise of due diligence. Assuming that the existence of Anderson's pending motion for reconsideration was a matter of public record, the information favorable to the defense was not so readily accessible. In order to learn that Anders had testified on Anderson's behalf, it would have been necessary for Ware to have the hearing transcribed since that information did not appear in the docket entries in Anderson's case. Likewise, in order to learn that both Anderson and Anders testified that Anderson heard two rather than three gunshots, it would have been necessary to have the hearing transcribed. It was not apparent from the docket entries that the court held the matter *sub curia* pending the outcome of Ware's case. Furthermore, the letters from Anders to James Gentry and to Judge Murphy were consciously excluded from the public records.

We conclude that, within the framework established by *Brady* and its progeny, in this case the State suppressed evidence concerning Anderson's pending motion for reconsideration of sentence. Ware did not have access to facts that would have permitted him to take advantage of the impeachment evidence stemming from Anderson's pending motion. Ware could not have been expected to embark on a fishing expedition and have the Anderson hearing transcribed in the hope that it revealed an agreement reflecting on Anderson's

bias or interest when the State had at least twice represented that there were no such promises, understandings, or agreements. Indeed, the fact that the prosecutor represented, as an officer of the court and in response to a very specific request, that the defense would not find anything exculpatory concerning Edward Anderson would have led the defense to believe that further investigation of Anderson would amount to nothing more than a fishing expedition and an unnecessary expenditure of financial and legal resources. In light of defense counsel's numerous specific requests for evidence of deals or agreements, and the State's repeated response that it knew of no such evidence, Appellant was entitled to rely on the word of the State and to direct its efforts in other directions.

It is beyond cavil that the suppressed evidence was favorable to Ware. Evidence of agreements or deals with witnesses often provides powerful impeachment evidence against a witness and enables a defendant to attack the motive or bias of a witness who might otherwise appear to have no motive to falsify or color his testimony. *See Giglio v. United States,* 405 U.S. at 154–55, 92 S.Ct. at 766; *see also Marshall,* 346 Md. at 193, 695 A.2d at 190. Although the State may not have entered into a tacit or formal agreement with Anderson (other than the letter agreement that the State would do whatever it could to protect Anderson in prison should his testimony endanger him), the circumstances surrounding Anderson's reconsideration of sentence were sufficient to support a strong inference that Anderson expected the State's assistance in his efforts to have his life sentence reduced. *See, e.g., Shaffer,* 789 F.2d at 690 (holding that facts implying agreement sufficient to require disclosure).

In the instant case, when the Circuit Court for Baltimore County decided to hold Anderson's sentence modification *sub curia* until the resolution of the Ware trial because "Mr. Anders's position may be a little different" after he hears Anderson's testimony, Anderson might reasonably have believed that, at least in the court's mind, Anders's enthusiasm about Anderson's sentence modification depended, at least in

part, on Anderson's "performance" at trial. Anderson was present in the courtroom when the judge made this ruling from the bench, and, although Anderson may have had no formal agreement or arrangement with the State, he could have reasonably expected that testimony favorable to the State at the Ware trial would redound to his benefit in the resolution of his pending motion for reconsideration. Information supporting this sort of expectation on the part of a State's witness falls within the category of favorable, impeachment evidence which the prosecutor must disclose to the defense. The State's contention that this information did not constitute *Brady* material due to the absence of a formal agreement "appears inconsistent with the policy underlying the government's witness-incentive disclosure obligations, which [have been] described as 'ensuring that the jury knows the facts that might motivate a witness in giving testimony.'" *Noriega*, 117 F.3d at 1219 (quoting *Smith v. Kemp*, 715 F.2d 1459, 1467 (11th Cir.), *cert. denied*, 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983)).

The final step in our analysis is to determine whether the suppressed evidence is material. *See Thomas*, 325 Md. at 190, 599 A.2d at 1185; *see also Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. Ware claims that the withheld evidence was material because he was unable to show bias, he was denied the derivative benefit of the evidence, i.e., that there was a contradiction (or perjury) in the testimony, and he was misled into believing that no inducement existed. Ware need not demonstrate that, after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough evidence left to convict him. He need only show that the "evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434-35, 115 S.Ct. at 1566. Given Anderson's centrality to the State's case and the degree of the State's involvement in Anderson's pending motion for reconsideration of sentence, we hold that there is a substantial possibility that the result would have been different, and that

the suppression of this evidence undermines confidence in the outcome of this case.

Edward Anderson was the only sensory witness to these crimes; Anderson was the only witness who heard gunshots. Although the State presented testimony of two other witnesses, Julius Jones and Jonathan Rinehamer, who testified that they saw Ware enter the Gentry home sometime between 12:00 noon and 1:00 p.m. on December 30, 1993, only Anderson placed Ware in the Gentry home at the precise time of the shootings. Anderson is also the only witness who identifies Ware as the shooter. Furthermore, there was little forensic evidence linking Ware to the murders. No blood was found on Ware's clothing nor was the murder weapon ever recovered. The State's expert on gunshot residue identified two particles of gunshot residue on the back of Ware's left hand, but other witnesses testified that Ware had discharged his gun the previous evening. Thus, although the State presented many witnesses, Anderson was a crucial witness for the State.

Anderson's testimony is also critical as it relates to premeditation. The State heavily relied on Anderson's testimony to support its theory of premeditation. Anderson testified at trial that he heard two shots in rapid succession and then a pause of approximately ten to thirty seconds followed by the third gunshot. In his closing argument, the State's Attorney emphasized to the jury that Anderson testified that there was a pause between the second and third shots:

> Well, let's remember what Eddie Anderson said. He heard three shots. He heard bang, bang, a pause and then bang. [Ware] shot through the finger, he shot to the chest and he leaned over and put the fatal bullet in her head. Bang, bang, a pause—*the deliberation, the thought—and the execution.*

Given the State's reliance on Anderson's account of hearing two shots, a pause, and then a third shot, cross-examination of Anderson concerning the fact that, at his sentence modification hearing, he stated that he heard *two* shots could have

seriously impeached Anderson's credibility. Had the jury chosen not to credit Anderson's testimony, it may have disbelieved his testimony in its entirety, or concluded that the State failed to prove first degree premeditated murder and instead convicted Ware of second degree murder. If Ware was successful in undermining the State's argument with regard to premeditation, Ware would have been ineligible for the death penalty since the only aggravating circumstance which the State relied upon was that the defendant committed more than one offense of murder in the first degree arising out of the same incident. Article 27, § 413(d)(9).

As in *Kyles*, 514 U.S. at 445, 115 S.Ct. at 1571, the "likely damage" of the State's suppression of evidence in this case "is best understood by taking the word of the prosecutor ... during closing argument." The State also emphasized Anderson's credibility in closing argument:

> [Anderson's testimony] is not concocted. You know that. *And what does he got to gain? There's no indication of any promises or inducements or his getting out of jail or ... Nothing's happening here. I mean, why would he put himself in jeopardy in an institution to come in here and make a up a lie for no reason?*

In *Reutter*, 888 F.2d at 582, discussed *supra*, the prosecutor made a similar statement in closing arguments when in fact the government had failed to disclose that the key prosecution witness, Trygstad, currently had a pending application for commutation of sentence. The court wrote:

> The materiality of the non-disclosed information becomes even more apparent in light of the prosecutor's closing remarks, which capitalized on defense counsel's ignorance by arguing to the jury that Trygstad had no possible reason to be untruthful in his testimony because he had already been sentenced and therefore had "nothing he could gain" from cooperating with the State. Although we would have less problem with these remarks if the state had disclosed to the defense the fact of Trygstad's impending commutation hearing, in the cir-

cumstances of this case the remarks can be regarded only as misleading and highly improper.

*Id.; see also State v. Oliver*, 682 So.2d 301, 310–11 (La.App. 1996) (lamenting that "to make matters worse, in the prosecutor's closing argument special mention was made of [the witness's] credibility."). We agree with the *Reutter* court that the prosecutor's claim in closing argument that Anderson had no reason to lie, under these circumstances, highlights the materiality of the suppressed information. One of the last things the jury heard in this case is that Anderson had no reason to lie.

We note that in *Kyles* the Court stressed that *Bagley* materiality is defined "in terms of suppressed evidence considered collectively, not item-by-item." 514 U.S. at 436–37, 115 S.Ct. at 1567. In this case, each individual piece of information about the State's role in Anderson's pending modification of sentence may not alone have been material to Ware's guilt or punishment. Ware established that: (1) Anders wrote letters on Anderson's behalf to the judge and the Assistant State's Attorney assigned to Anderson's motion for reconsideration; (2) Anderson stated at the hearing on his reconsideration of sentence that he planned to testify at Ware's trial that he heard two gunshots, a statement inconsistent with his trial testimony that he heard three gunshots; (3) Anders testified at the same hearing and stated that Anderson would testify that he heard two gunshots; (4) the circuit court held Anderson's motion for reconsideration of sentence *sub curia* pending the outcome of the Ware case since Anders's "position may be a little different" after hearing Anderson's trial testimony; (5) Anders drafted the pleadings necessary to effect Anderson's transfer to a different facility; and (6) Anders wrote a letter to the Circuit Court for Baltimore County at the request of Anderson's attorney reporting Anderson's cooperation with the State.

Taken together, the potential impact on cross-examination of the nondisclosed information is sufficient to undermine confidence in the outcome of the proceeding under these circumstances. *See Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566;

*Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383. Accordingly, we find that a new trial is warranted.

## III.

Given our disposition of the *Brady* violation, we need not address all of Ware's allegations of error. We shall address certain of them, however, for the guidance of the trial court on remand.

### *Jury Instruction*

Ware contends that the trial court at the sentencing phase of his trial incorrectly instructed the jury concerning the need for unanimity in Section V of the Findings and Sentencing Determination form. Pursuant to Maryland Rule 4–343(e), Section V of the form given to the jury read as follows:

### Section V

Each individual juror shall weigh the aggravating circumstance found unanimously to exist against any mitigating circumstances found unanimously to exist, as well as against any mitigating circumstance found by that individual juror to exist.

We unanimously find that the State has proven by A PREPONDERANCE OF THE EVIDENCE that the aggravating circumstance marked "proven" in Section III outweigh the mitigating circumstances in Section IV.

_____ _____

Yes No ·

Ware requested the following jury instruction concerning the unanimity required by Section V.

If you unanimously find that the State has proven by a preponderance of the evidence that the aggravating circumstance(s) outweigh(s) the mitigating circumstance(s), the sentence shall be death. If so, you are to mark "yes" in Section [V] of the sentencing form and enter "death" in Section [VI]. If you do not unanimously find that the

> State has proven by a preponderance of the evidence that the aggravating circumstance(s) outweigh(s) the mitigating circumstance(s), the sentence shall be life imprisonment. Then, you are to mark "no" in Section [V] and enter "life imprisonment" in Section [VI] and proceed to Section [VII].

The court denied Ware's requested instruction. The court instead instructed the jury using Maryland Criminal Pattern Jury Instructions (MPJI–Cr) § 7:00, as well as some additional instructions. The court instructed the jury on the unanimity requirements of Section V as follows:

> In Section V, each of you must determine for yourself whether the State has persuaded you, by a preponderance of the evidence, that the aggravating circumstance found in Section III outweighs whatever mitigating circumstance or circumstances found in Section IV. A "Yes" answer in Section V is permissible only if you are persuaded by a preponderance of the evidence that the aggravating circumstance unanimously found in Section III outweighs any mitigating circumstance or circumstances found by one or more jurors in Section IV.

> If any of you finds that one or more mitigating circumstances have been proven, carefully weigh any such circumstance or circumstances against the aggravating circumstance recorded in Section III. Your personal finding should be "yes" if you are persuaded, by a preponderance of evidence, that the aggravating circumstance outweighs the mitigating circumstance or circumstances, and that death is therefore the appropriate penalty to be imposed. If you are not persuaded, by a preponderance of the evidence, that the aggravating circumstance outweighs the mitigating circumstance or circumstances, your personal findings in Section V should be "No". In this weighing process, you must apply your reasoned judgment. You are not merely counting aggravating and mitigating circumstances. Give each circumstance the weight you believe it deserves based on all the evidence. Your determination in Section V must be unanimous.

Until all twelve of you agree on whether the answer is "Yes" or "No," do not go on to Section VI.

Now, if you reach a unanimous agreement—and let's just take a look for a second at ... the conclusion of Section V, and the question ... "We unanimously find that the State has proven by A PREPONDERANCE OF THE EVIDENCE that the aggravating circumstance marked "Proven" in Section III outweighs the mitigating circumstances in Section IV." And your answer will be either "Yes" or "No."

Now, if you reach a unanimous agreement in Section V, you go to Section VI. If you answered "Yes" in Section V, your sentencing determination in Section VI should be "Death." If you answered "No" in Section V, then enter "Life Imprisonment" in Section VI of the form. This sentencing determination must be unanimous. Each of you must agree on whether the sentence should be life imprisonment or death before that ultimate determination can be entered in Section VI of this form. And as you can see at the bottom of the Page 5, pursuant to the instructions that have been given, you will enter either "Death" or "Life Imprisonment." [16]

The jury entered a determination of death on both counts of first degree murder.

Ware contends that the instruction that the court gave was improper because it misled the jury concerning the need for unanimity under Section V. Ware argues that although the jury must unanimously agree that the aggravating circumstances outweigh the mitigating circumstances in order to impose a death sentence, the jury need not unanimously agree that the aggravating circumstances *did not* outweigh the mitigating circumstances in order for the jury to impose a life sentence. Thus, he continues, juries must *not* be instructed that unanimity is required in Section V in order for the jury to impose a sentence of life imprisonment.

---

**16.** The last two paragraphs do not appear in the Maryland Criminal Pattern Jury Instructions.

The State, on the other hand, argues that the instruction was proper. The State contends that unanimity is required for the jury to impose either a life sentence or sentence of death, and thus it was proper to instruct the jury that they must be unanimous in their sentencing determination. The State relies on decisions of this Court that reject the contention that the inability to agree is itself a verdict, and also relies on this Court's holdings that the jury in a capital sentencing proceeding should not be instructed of the consequences of their inability to agree.

■■■ The trial court correctly instructed the jury concerning the unanimity requirement under Section V of the verdict form; Appellant was not entitled to his requested instruction. Maryland Rule 4–325(c) requires the trial court to give a requested instruction under the following circumstances: (1) the requested instruction is a correct statement of the law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instruction actually given. Md. Rule 4–325(c); *Evans v. State*, 333 Md. 660, 691, 637 A.2d 117, 132, *cert. denied*, 513 U.S. 833, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994). Ware's requested instruction fails the first part of this test. The requested instruction is not a correct statement of the law because it incorrectly advises the jury that unanimity is not required in order for the jury to impose a life sentence.

Article 27, § 413 governs sentencing procedures in capital cases. Section 413(h) addresses the weighing of aggravating and mitigating circumstances and provides:

> (1) If the court or jury finds that one or more of these mitigating circumstances exist, it shall determine whether, by a preponderance of the evidence, the aggravating circumstances outweigh the mitigating circumstances.

> (2) If it finds that the aggravating circumstances outweigh the mitigating circumstances, the sentence shall be death.

(3) If it finds that the aggravating circumstances do not outweigh the mitigating circumstances, a sentence of death may not be imposed.

Section 413(i) provides: "The determination of the court or jury shall be in writing, and, if a jury, shall be unanimous and shall be signed by the foreman." The General Assembly, in enacting in Article 27, § 413(k)(2), also addressed the eventuality that a capital sentencing jury would be unable to achieve unanimity:

If the jury, within a reasonable time, is not able to agree as to whether a sentence of death shall be imposed, the *court* may not impose a sentence of death.

Article 27, § 413(k)(2) (emphasis added).

 Thus, under the statutory scheme governing capital sentencing, the jury must unanimously decide whether aggravating circumstances outweigh the mitigating circumstances by a preponderance of the evidence.[17] *See* Art. 27, § 413(i); *cf. Harris v. State,* 295 Md. 329, 339–40, 455 A.2d 979, 984 (1983) (noting that sentencing in capital case must be by unanimous verdict of jury). A construction of the statute that did not require unanimity for the sentencing determination would render § 413(k)(2) surplusage. A cardinal rule of statutory construction is to avoid constructions of statutes that render a portion of the statute surplusage. *Gisriel v. Ocean City Elections Board,* 345 Md. 477, 492, 693 A.2d 757, 764 (1997), *petition for cert. filed,* No. 97–5900 (Sep. 8, 1997); *State v. Pagano,* 341 Md. 129, 134, 669 A.2d 1339, 1341 (1996); *Warsame v. State,* 338 Md. 513, 519, 659 A.2d 1271, 1273 (1995); *Williams v. State,* 329 Md. 1, 19, 616 A.2d 1275, 1284 (1992). As discussed above, Article 27, § 413(k)(2) provides that if the jury, after a reasonable time, is unable to agree on whether death is the appropriate sentence the court may not

---

**17.** We note for clarity that the jury is not required to be unanimous in its determination that a mitigating circumstance exists in order to consider that mitigating circumstance in the balancing process. *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

impose a sentence of death.[18] If Ware's theory were correct, however, § 413(k)(2) would be entirely unnecessary. If the jury were unable to agree on whether to impose a sentence of death, it would not report that it was deadlocked; instead the jury would enter a sentence of life imprisonment. Under Ware's theory, there could not be a "hung jury" in capital cases, and thus there would be no need for a statutory provision governing the consequences of the jury's inability to agree that a death sentence should be imposed.

The Supreme Court of North Carolina recently addressed a similar instruction requested by the accused in a death penalty case. In *State v. McCarver,* 341 N.C. 364, 462 S.E.2d 25 (1995), *cert. denied,* 517 U.S. 1110, 116 S.Ct. 1332, 134 L.Ed.2d 482 (1996), the defendant contended that the trial court erred by refusing to instruct the jury that it did not need to be unanimous to answer "No" in the section on the North Carolina sentencing form that is nearly identical to Maryland's Section V. *Id.* 462 S.E.2d at 38–39. The North Carolina Supreme Court held that instructing the jury as the defendant wished would "conflict[ ] . . . with the language of our death penalty statute and will force juries to reach final sentence recommendations of life imprisonment when they are *not unanimous." Id.* 462 S.E.2d at 41. The court continued: "Allowing nonunanimous juries to reach final sentence recommendations of life imprisonment is in direct contradiction to our statutory requirement that 'the sentence recommendation must be agreed upon by a unanimous vote of the 12 jurors.' " *Id.*

We likewise conclude that the Appellant's requested instruction conflicts with the mandate of § 413(i) that the sentence determination of the jury be unanimous, and consequently, the requested instruction as it pertains to the unanimity requirements under Section V does not constitute a correct statement

---

18. A capital defendant is not entitled to an instruction informing the jury of the consequences of its inability to agree. *See Bruce v. State,* 328 Md. 594, 622, 616 A.2d 392, 406 (1992); *Oken v. State,* 327 Md. 628, 642–43, 612 A.2d 258, 264–65 (1992); *Calhoun v. State,* 297 Md. 563, 594–95, 468 A.2d 45, 59–60 (1983).

of the law. In sum, Ware was not entitled to this requested instruction and the given instruction was proper.

### Victim Impact Statements

 We turn now to Ware's contention that the trial court erred in accepting into evidence written victim impact statements that were submitted by the State's Attorney's Office to the Division of Parole and Probation (Parole and Probation) for inclusion in the pre-sentence investigation.

In accordance with Maryland Code (1957, 1997 Repl.Vol.) Article 41, § 4–609(d),[19] Parole and Probation completed a presentence investigation (PSI) in this case, including written victim impact statements from family members of both victims. The PSI stated that "Victim Impact Statements have been acquired by Ms. Cynthia Haworth of the Anne Arundel County State's Attorney's Office and copies of those statements received are attached."

In a pre-trial motion and then again immediately prior to the sentencing phase, Ware attempted to limit written victim impact evidence to those victim impact statements prepared by Parole and Probation, effectively asking to exclude all written victim impact statements from the sentencing hearing. The trial court denied the motion. Ware then attacked the substance of the written victim impact statements because several of them contained the family members' sentencing recommendations. The State agreed to redact the portions of the statements in which the family members recommended that Ware be sentenced to death. *See* Art. 27, § 413(c)(iv) ("[A]ny recommendation as to sentence contained in the [PSI] report is not admissible....."). The State also agreed to exclude those victim impact statements prepared by individuals not related to the victims.

Ware contends that the admission of the written victim impact statements violated Article 41, § 4–609(d) and contra-

---

**19.** Hereinafter all citations to Article 41 shall be to Maryland Code (1957, 1997 Repl.Vol.) Article 41.

vened this Court's decision in *Williams v. State,* 342 Md. 724, 679 A.2d 1106 (1996). Before this Court, Ware contends that the statute does not permit the State's Attorney's Office to acquire victim impact statements and then submit them to Parole and Probation for inclusion or incorporation in the PSI. In contrast, the State maintains that the victim impact statements were properly admitted because, although submitted to Parole and Probation by the State's Attorney's Office, the PSI reflects that Parole and Probation accepted the victim impact statements and incorporated them into the PSI.

Article 41, § 4–609(d) mandates that Parole and Probation conduct presentence investigations in every case in which the State seeks the death penalty or imprisonment for life without parole. Article 41, § 4–609(d) states:

> In any case in which the death penalty or imprisonment for life without the possibility of parole is requested under Article 27, § 412, a presentence investigation, including a victim impact statement as provided under Article 27, § 781 of the Code, shall be completed by the Division of Parole and Probation, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted under Article 27, § 412 or § 413.

This Court recently construed Article 41, § 4–609 in the context of a capital sentencing proceeding. In *Williams,* the trial court admitted two victim impact statements written by friends and colleagues of the two victims which were not made part of the PSI prepared by Parole and Probation but were instead submitted to the court by the prosecutor independent of the PSI. Victim impact statements were not included in the *Williams* PSI despite § 4–609(d)'s mandate that the PSI include victim impact statements. *Williams,* 342 Md. at 762, 679 A.2d at 1126. We agreed with the appellant in *Williams* that it was error to admit the victim impact statements under those circumstances. Judge Chasanow, writing for the Court, explained:

> The only written victim impact statement admissible in a death penalty case is that contained in the PSI prepared

by the Division of Parole and Probation and specifically authorized as well as required by § 4–609(d). Because the statements written by friends of [the victims] were not included in or incorporated as part of a PSI prepared pursuant to § 4–609(d), they should not have been admitted.

*Id.* at 763, 679 A.2d at 1126. The Court summarized that "the only written victim impact statements that are admissible in death penalty cases are those made part of a PSI." *Id.*, 679 A.2d at 1126.

The trial court satisfied the requirements of § 4–609(d) in this case. The PSI clearly reflects that the victim impact statements were included in or incorporated as a part of the PSI. Neither § 4–609(d) nor our opinion in *Williams* dictates any particular person or agency as the responsible party for procuring the victim impact statements that ultimately become a part of the PSI. Section 4–609(d) dictates that the PSI shall include a victim impact statement, and *Williams* limits the admissibility of victim impact statements to those "made part" of the PSI. It is clear that a PSI must include a victim impact statement, a PSI is required in death penalty cases, and only those victim impact statements contained in the PSI may be admitted. The record reflects that those requirements were met in this case, regardless of who actually acquired the victim impact statements and submitted them to the Division of Parole and Probation for inclusion in the PSI.

### Demonstrative Evidence

We shall also address Ware's contention that the trial court committed reversible error by preventing Ware from displaying a tire iron[20] as demonstrative evidence. Ware called as a witness Irene Owens, a next-door neighbor of the Gentrys. Owens testified that on the day of the murders she

---

**20.** The parties and the trial court referred to the object in question by several different names. One witness described the object as one used "to take the tires on and off, you know, to tighten the bolts on the tires." We shall refer to the object as a tire iron.

saw Ware near the curb in front of her house picking up an object that was black or brown in color and measuring between twelve and eighteen inches long. At this point in Owens's testimony, Ware sought to introduce a tire iron into evidence. Following the State's objection, the court held a hearing outside the presence of the jury. When asked to describe the object she saw, the witness stated: "I couldn't tell you what it looked like. All I know was long and like a stick.... I don't have a clue what it looks like, you know." After the voir dire, the trial court ruled:

> Well, I think this witness is a very credible lady. As she said, she's without a clue is what her words were. So I'm not going to let you put that in—that thing in front of her at this juncture.

Ware argued at trial that the tire iron was relevant because it was the defense's theory that Ware never wielded a gun against Kevin Gentry, but instead wielded a tire iron that he kept in his Jeep. In his initial interview with detectives shortly after he was arrested, Ware told the police that he had thrown a crowbar at Kevin Gentry after Kevin Gentry beat him. Kevin Gentry, however, testified that Ware pointed a gun at him, not a crowbar. The tire iron was later entered into evidence during the testimony of defense witness Antonio Barnes, who testified that the tire iron was substantially similar to one he had seen in Ware's Jeep on two occasions prior to December 30, 1993.

Ware argues that the trial court improperly prohibited him from questioning Owens about whether the tire iron resembled the object she saw, and thereby prevented him from corroborating his assertion that he did not have a gun in his possession on the morning in question, contrary to Kevin Gentry's account of the events. Ware maintains that the tire iron was proper demonstrative evidence, and that this Court has sanctioned the use of demonstrative evidence to illustrate or explain a witness's testimony. In the alternative, Ware contends that the State's cross-examination of Owens "opened the door" to introduction of the tire iron.

Demonstrative evidence has been described as physical evidence that "helps the jurors understand the testimony, but is otherwise unrelated to the case." JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 1101, at 576 (2d ed.1993); *see, e.g., Grandison v. State,* 305 Md. 685, 731–33, 506 A.2d 580, 603–04 (1986); *Evans v. State,* 304 Md. 487, 520–21, 499 A.2d 1261, 1278–79 (1985). Demonstrative evidence is generally offered for clarification or illustration of the witness's testimony and it need not be original or authentic. "Instead, the theory justifying admission of these exhibits requires only that the item be sufficiently explanatory or illustrative of relevant testimony to be of potential help to the trier of fact." 2 MCCORMICK ON EVIDENCE § 212, at 9 (J. Strong 4th ed.1992).

The decision to admit demonstrative evidence rests within the sound discretion of the trial court. Professor McLain discusses the foundation requirements for demonstrative evidence:

> A foundation simply must be laid through the witness' testimony that *the evidence fairly and accurately depicts what it purports to depict (a subject as to which the witness has the required knowledge)* and that it will be helpful to the witness in explaining his or her testimony. It is then admissible in the trial court's discretion; if the court determines that the evidence will be helpful to the trier of fact, it will allow it.

LYNN MCLAIN, MARYLAND EVIDENCE § 403.3, at 310 (1987) (emphasis added). The court must weigh the demonstrative evidence's probative value against the possibility of unfair prejudice or confusion. *See, e.g., Williams,* 342 Md. at 737, 679 A.2d at 1114. The trial judge's determination will not be reversed absent a clear abuse of discretion. *Id.,* 679 A.2d at 1114.

We conclude that the trial court did not abuse its discretion in precluding Appellant from introducing the tire iron during the testimony of Irene Owens because Appellant failed to lay

an adequate foundation for its introduction.[21] Although demonstrative evidence need not be original in order to be admissible, there must be "ample evidence" that the item offered as demonstrative evidence is substantially similar to the item that actually played a part in the events at issue. *Grandison*, 305 Md. at 732, 506 A.2d at 603. In this case, we cannot say that the trial court erred in concluding that there was insufficient evidence of the similarity between the tire iron proffered as demonstrative evidence and the item that Owens saw Ware pick up in her yard. In fact, Owens stated several times that she did not know what the item was nor could she describe the item any more specifically than that it was dark in color and twelve to eighteen inches long. Thus, Ware failed to establish the necessary foundation that the demonstrative evidence accurately represented what it purported to represent. *See State v. United Rys Co.*, 162 Md. 404, 417, 159 A. 916, 919 (1932) (holding that the trial court did not err in excluding photograph of accident location during testimony of railroad employee who stated that he did not know where the accident occurred).

### Impeachment Evidence

We address Ware's final contention that the trial court improperly allowed the State to elicit testimony from witness Antonio Barnes concerning money buried in the backyard of the Gentry residence. Antonio Barnes was Ware's friend and roommate. In response to the State's questions on cross-examination, Barnes testified that he visited Ware at the detention center in mid-August 1995, approximately one month before trial, and Ware told Barnes that there was money buried in the backyard of the Gentry residence in the corner of a flower box. Barnes testified that at first he did

---

**21.** We also find meritless Appellant's argument that the State during its crossexamination of Irene Owens "opened the door" to introduction of the tire iron. In its short cross-examination of this witness, the State merely asked how long Owens observed Ware in her yard. The State did not probe Owens's inability to identify the object that she saw Ware pick up in her yard.

not act on this information from Ware, but eventually his curiosity about the buried money made him unable to sleep. Barnes went to the Gentry residence, informed Nina Gentry, Kristi's mother, that there was something buried in her backyard, and asked if he could dig up the flower box. Barnes testified that Mrs. Gentry told him that she would rather not dig up the flower box unless the detectives were present. The police later excavated the flower box as well as other parts of the Gentry's backyard, but found nothing buried there.

Prior to the State's cross-examination of Barnes, Ware filed a motion in limine seeking to exclude all references to the buried money. The trial court denied the motion. Ware argues before this Court that the discussion concerning the buried money was not probative to show Barnes's bias. Ware further contends that because the evidence suggested that Ware was involved in criminal activity resulting in illicit gains, it was unduly prejudicial.

"Wide latitude must be given a cross-examiner in exploring a witness's bias or motivation in testifying." *Bruce v. State*, 318 Md. 706, 727, 569 A.2d 1254, 1265 (1990), *cert. denied*, 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993). In particular, the cross-examiner must be given latitude to cross-examine a witness concerning any bias or interest the witness may have that would lead the witness to shade his testimony, whether consciously or not, in favor of or against a party. *See Marshall,* 346 Md. at 193, 695 A.2d at 190 (holding that the trial court erred in restricting defendant's cross-examination of a witness who had entered into a plea agreement with the State before testifying); *Smallwood v. State,* 320 Md. 300, 311, 577 A.2d 356, 361 (1990) (holding that trial court committed reversible error by precluding cross-examination of Smallwood's girlfriend's bias or interest arising out of two unsuccessful attempts to have Smallwood convicted of other charges); McLain, *supra,* § 607.2, at 43.

"The extent to which a witness may be cross-examined for the purposes of showing bias rests with the sound discretion of the trial judge." *Ebb,* 341 Md. at 587, 671

A.2d at 978. To be sure, not all relevant impeachment evidence is necessarily admissible, and the trial judge "must balance the probative value of an inquiry against the unfair prejudice that might inure to the witness." *State v. Cox*, 298 Md. 173, 178, 468 A.2d 319, 321 (1983). We cannot conclude that the balance struck was an abuse of discretion.

The evidence of the buried money was relevant to show Barnes's bias and interest arising out of Ware's efforts to curry favor with Barnes by offering financial rewards. On direct examination, defense counsel established that Barnes and Ware were close friends and that Ware had given Barnes his Jeep Cherokee and allowed Barnes to keep the proceeds from the sale of the Jeep. The State elicited on cross-examination that Ware paid Barnes $200 shortly after Ware was arrested to pay for Ware's share of the rent on their shared apartment. Given the history of Barnes and Ware's relationship, the trial court did not abuse its discretion in permitting the State to explore this potential source of bias or interest on cross-examination.

In conclusion, we reverse the judgment of the Circuit Court for Howard County. The message regarding a prosecutor's duty to turn over evidence should be clear:

> By requiring the prosecutor to assist the defense in making its case, the *Brady* rule represents a limited departure from a pure adversary model. The court has recognized, however, that the prosecutor's role transcends that of an adversary: he "is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done."

*Bagley*, 473 U.S. at 676 n. 6, 105 S.Ct. at 3380 n. 6 (citations omitted). Again, the Supreme Court stated, "a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." *Kyles*, 514 U.S. at 419, 115 S.Ct. at 1568. In the instant case, as the trial judge commented, the prosecutor tacked too close to the wind.

*JUDGMENTS REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR A NEW TRIAL. COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.*

BELL, C.J., concurs and dissents.

BELL, Chief Judge, concurring and dissenting.

I concur in and, therefore, join in all but part III A of the majority opinion.

In my opinion, the instruction, at issue on part III A, which the appellant timely requested, is a correct statement of the law; unanimity as an option available to the jury. For my views on that subject, see my dissenting opinions in *Booth v. State*, 327 Md. 142, 203, 608 A.2d 162, 192 (1992) and *Oken v. State*, 327 Md. 628, 684, 612 A.2d 258, 286 (1992).